1   R. Christopher Locke (State Bar No. 101704)
   Email:  clocke@fbm.com
2   Sarah P. Bell (State Bar No. 227082)
   Email:  sbell@fbm.com
3   Linda T. Sobczynski (State Bar No. 307107)
   Email:  lsobczynski@fbm.com
4   Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
5   San Francisco, California 94104
Telephone: (415) 954-4400
6   Facsimile: (415) 954-4480

7   Attorneys for Plaintiffs Levin Richmond
Terminal Corporation, Richmond Pacific
8   Railroad Corporation, and Levin Enterprises, Inc.

9

10   UNITED STATES DISTRICT COURT

11   NORTHERN DISTRICT OF CALIFORNIA

12

| LEVIN RICHMOND TERMINAL CORPORATION, RICHMOND PACIFIC RAILROAD CORPORATION, and LEVIN ENTERPRISES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF RICHMOND, CITY COUNCIL OF THE CITY OF RICHMOND, and DOES 1 to 100, inclusive, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> [UNCONSTITUTIONAL INTERFERENCE WITH INTERSTATE AND FOREIGN COMMERCE; FEDERAL PREEMPTION; UNCONSTITUTIONAL TAKING OF PROPERTY; UNCONSTITUTIONAL IMPAIRMENT OF CONTRACTUAL RELATIONS; UNCONSTITUTIONAL DEPRIVATION OF DUE PROCESS AND EQUAL PROTECTION] |
| --- | --- |

Plaintiffs Levin Richmond Terminal Corporation ("LRTC"), Richmond Pacific Railroad Corporation ("RPRC"), and Levin Enterprises, Inc. ("Levin Enterprises" and, collectively with LRTC and RPRC, "Levin" or "Plaintiffs"), hereby file this Complaint for Declaratory and Injunctive Relief ("Complaint"), and allege as follows:

## NATURE OF THE ACTION

1.  On February 4, 2020, Defendants the City of Richmond and its City Council (collectively, "Richmond" or the "City") adopted an ordinance entitled "Prohibition on the Storage and Handling of Coal and Petroleum Coke" ("Ordinance") amending the Richmond Municipal

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

36087\13079528.1

Code ("RMC").[1]  The Ordinance prohibits "the storage and handling of coal and petroleum coke at a coal or petroleum coke storage and handling facility" and, in so doing, would prohibit continued transloading and export of coal and petroleum coke ("petcoke") at a marine terminal on property owned by Levin Enterprises and operated by LRTC for more than 37 years.

2.      Levin brings this action to invalidate and enjoin the Ordinance, which constitutes an improper exercise of police powers, violates Constitutional protections and unduly burdens interstate and foreign commerce, is preempted by federal law, violates Constitutional protections against taking of property and business interests, impairs Levin's Constitutional rights to due process, equal protection and contractual relations, and is arbitrary, capricious and unlawful.

3.      The City's asserted justification for the Ordinance, that it is "necessary for public health and safety as it will reduce particulate matter emissions and toxic exposure from coal and petroleum coke storage" and for "protecting the public from the health hazards of coal and petroleum coke storage and handling" at the LRTC facility, is not supported by the record.  The record provides no rational factual basis for this asserted legislative purpose or exercise of police power.

4.      The record contains no scientific data or credible evidence identifying the LRTC facility as a source of harmful fugitive dust emissions.  The record shows, to the contrary, that LRTC is *not* a source of harmful fugitive dust emissions, nor do coal or petcoke operations at LRTC pose other adverse impacts to justify the need for the Ordinance.

5.      In adopting the Ordinance, the City Council rejected the express and unanimous recommendation of the City's Planning Commission that the City Council "*not* adopt the proposed ordinance" because the Planning Commission "*cannot* find that the proposed ordinance is necessary for public health, safety and welfare, and expressed its position that *additional study is needed* to better understand the air quality impacts of operations at existing sites . . .  [and] the potential economic impacts to the City of Richmond." (emphasis added).[2]

---

[1]  A copy of the City's February 4, 2020 Agenda Item Request Form, Agenda Report and Ordinance is attached as Exhibit A to this Complaint.

[2]  A copy of Resolution No. 19-29, unanimously adopted by the Planning Commission on July 18,

Farella Braun + Martel LLP
235 Montgomery Street, 17ᵗʰ Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

2

36087\13079528.1

6.      The City has not performed the economic impact report recommended by the Planning Commission concerning the effect of the Ordinance on jobs and the community. However, an air monitoring study was performed by Sonoma Technology, Inc. ("STI") that shows the LRTC facility is *not* a source of harmful fugitive dust emissions.  STI, *Supplemental Report on the Assessment of the State of Data and Science Underlying the Proposed Ordinance Prohibiting Coal and Petcoke Storage and Handling in Richmond*, at 2 (Nov. 19, 2019) ("Supplemental STI Assessment").

7.      The Supplemental STI Assessment was submitted to the City Council by Levin on November 26, 2019.  Nevertheless, and contrary to the recommendation of the Planning Commission, the City Council proceeded with adoption of the Ordinance on February 4, 2020.

8.      The City's Agenda Report accompanying the Ordinance acknowledges "restrictions on the City's ability to regulate interstate commerce," and the Ordinance asserts that it is not intended to regulate or prohibit "the transportation of coal and/or petroleum coke, for example, by train or marine vessel, including without limitation through the City of Richmond or to or from a coal or petroleum coke storage and handling facility."

9.      In fact, however, the record shows that the Ordinance will regulate and prohibit the transportation of coal and pet by rail and marine vessel by prohibiting the storage and handling of coal and petcoke at the LRTC facility, which is a point of transfer of these commodities from interstate rail and truck transport to overseas export in marine vessels.

10.      The City's Agenda Report acknowledges that the LRTC facility is the only marine terminal in Richmond that stores and handles coal and petcoke, and that prohibiting these commodities there would require exports to "shift from one West Coast port to another."  Thus, the Ordinance directly affects and unduly burdens interstate and foreign commerce.

11.      Richmond Mayor Butt similarly observed during consideration of the Ordinance that, "[b]ecause of Federal preemption, we cannot regulate the transportation of coal by rail." Tom Butt E-Forum:  *Coal Dust in Richmond* (Dec. 18, 2018).  In a recent interview conducted by KCPW radio, the Mayor again acknowledged that the City has "no regulatory authority over the

2019, is attached as Exhibit B to this Complaint.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

3

36087\13079528.1

railroads," but admitted the unconstitutional and federally preempted effect of the Ordinance:  By prohibiting LRTC coal operations, "then the coal trains go away."[3]

12.     The Ordinance also constitutes an unconstitutional taking of Levin's property and business interests.  Transloading of coal and petcoke represents more than 80 percent of LRTC's business, with coal alone accounting for more than 65 percent of the business.  Transfer of coal by rail between interstate rail lines in Richmond and the LRTC facility represents approximately 50 percent of RPRC's business.

13.     The owners of these commodities – Wolverine Fuels in the case of coal and Phillips 66 in the case of petcoke – are solely responsible for production, export and sale, and for arranging the rail and truck deliveries to the LRTC facility and overseas shipments from the LRTC facility.

14.     The Ordinance provides a three year period for LRTC to discontinue storage and handling of coal and petcoke, and the accompanying Agenda Report states that "City staff believe that the three-year amortization period provided in the ordinance will be appropriate" to avoid an unconstitutional taking of property.

15.     However, an economic analysis by Berkeley Research Group ("BRG") economists found that (1) the Ordinance amortization period will not allow LRTC to avoid significant economic harm, given the nature of the facility and the market for suitable alternative commodities; (2) the Ordinance criteria for seeking to extend the amortization period fails to take account of the nature of the facility and the market; and (3) the Ordinance is likely to put LRTC out of business.  Danner and Serwin, *City of Richmond ordinance to prohibit storing and handling coal and petroleum coke:  An economic evaluation of proposed amortization period*, at 3 (Nov. 21, 2019) ("BRG Economic Evaluation").  Levin provided the BRG Economic Evaluation to the City Council on November 26, 2019.

16.     As stated in the BRG Economic Evaluation, "LRTC is a unique marine facility and its operations (the transloading of coal, petcoke and scrap metal) are limited by the economic

---

[3]  February 12, 2020 interview with Richmond Mayor Tom Butt, KCPA, available at https://kcpw.org/blog/in-the-hive/2020-02-13/the-latest-battle-brewing-over-the-future-of-utahs-coal-industry/.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

market conditions for these and other dry bulk commodities." After evaluating the size and features of the LRTC facility, as well as market conditions, space and infrastructure requirements for more than 15 potential alternative commodities, the economists concluded that "it would be speculative to suggest that any such alternative dry bulk business will be available to LRTC in the foreseeable future." BRG Economic Evaluation, at 4-5.

17. The Ordinance will also end the employment of the employees of LRTC and RPRC, causing direct and substantial harm to these employees, many of whom are Richmond residents, and most of whom are members of the Operating Engineers Union Local 3.

18. The process for applying to the Planning Commission for an exception from the Ordinance or an extension of the amortization period does not diminish the unconstitutionality of the Ordinance, facially or as applied to Levin, nor does it affect the ripeness of Levin's claim that the Ordinance constitutes an unconstitutional taking of property and business interests, nor do these provisions affect the validity of any other cause of action in this Complaint.

19. The BRG Economic Evaluation found that the criteria for seeking to extend the amortization period fails to take account of the unique nature of the LRTC facility or the market for potential, economically viable alternative commodities to replace coal and petcoke.

20. The Ordinance provision regarding a potential exception from the Ordinance does not apply to a legal "non-conforming use" such as the LRTC facility. To the extent the exception provision does apply, the process for seeking an exception from the Ordinance utilizes the same inapplicable and meritless criteria as exists for seeking an extension of the amortization period, as addressed in the BRG Economic Evaluation.

21. The Ordinance, facially and as applied to Levin, is an unlawful and invalid exercise of the City's police power, imposes an unconstitutional burden on interstate and foreign commerce, is federally preempted, violates Constitutional protections against taking of property and guarantees of due process and equal protection, singles out Levin, and is arbitrary, capricious, an abuse of discretion and unlawful.

22. The City's unconstitutional, federally preempted, unjustified, and unlawful adoption of the Ordinance is lacking in factual support and legal merit, and will deprive Levin of

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

5

36087\13079528.1

1   the value of Levin's property and business interests, causing direct, substantial and irreparable

2   harm to Levin.

3         23.    Levin respectfully requests this Court's intervention in providing declaratory and

4   injunctive relief from the Ordinance, as set forth herein, as well as awarding Levin attorneys' fees

5   and costs, and such other relief as the Court deems just and proper.

6                                        **PARTIES**

7         24.    Plaintiff Levin Enterprises, Inc. is a California corporation with its principal place

8   of business located at 112 Washington Street, Suite 250, Richmond, California.  Levin

9   Enterprises, Inc., is the owner of the real property occupied and operated by LRTC as a marine

10  terminal, and is authorized to do business in California.

11        25.    Plaintiff LRTC is a California corporation with its principal place of business

12  located at 402 Wright Avenue, Richmond, California, and is a wholly-owned subsidiary of Levin

13  Enterprises, Inc.  The LRTC facility has operated as a port and marine terminal since 1981, is

14  permitted by the Bay Area Air Quality Management District ("BAAQMD") for dry bulk material

15  and diesel emissions, by the California Air Resources Board ("CARB") for mobile equipment

16  diesel emissions, and by the State Water Resources Control Board ("SWRCB") for storm water

17  management and discharge.  LRTC is authorized to do business in California.  As set forth above,

18  transloading of coal and petcoke represents more than 80 percent of LRTC's business.

19        26.    Plaintiff RPRC is a California corporation with its principal place of business

20  located at 402 Wright Avenue, Richmond, California, and is a wholly-owned subsidiary of Levin

21  Enterprises, Inc.  RPRC is a Class III rail common carrier that provides freight service on trackage

22  leased from Union Pacific Railroad Company and Burlington Northern and Santa Fe Railway

23  Company, and trackage located in and around LRTC.  RPRC is authorized to do business in

24  California.  The transfer of coal by rail between interstate rail lines and the LRTC facility

25  represents approximately 50 percent of RPRC's business.

26        27.    Defendant City of Richmond is a municipal corporation located in Contra Costa

27  County, California, and is a charter city organized under the Constitution and laws of the State of

28  California.  The City of Richmond is located in the Northern District of California.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

6

36087\13079528.1

28.     Defendant City Council of the City of Richmond is an elected governing body for the City of Richmond.  As a decision-making body for the City, the City Council is required to comply state and federal laws in undertaking legislative and administrative actions, including the adoption of ordinances.

29.     Levin is unaware of the true names of Defendants sued herein as Does 1 through 100, inclusive.  Levin is informed and believes, and on that basis alleges, that Defendants Does 1 through 100, inclusive, are individuals, entities or agencies with authority to approve and/or with an interest in the Ordinance.  When the true identities of these Defendants have been determined, Levin will seek to amend this Complaint to include such Defendants.

**JURISDICTION AND VENUE**

30.     This Court has subject-matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331 (federal question) because such claims request, pursuant to 42 U.S.C. § 1983, that this Court interpret and apply the Commerce Clause, the Takings Clause, the Due Process and Equal Protection guarantees, and the Impairments Clause of the United States Constitution; and because such claims request that this Court interpret and apply federal laws, specifically the Interstate Commerce Commission Termination Act ("ICCTA") and the Shipping Act of 1984.

31.     This Court also has jurisdiction pursuant to its inherent equitable powers to enforce federal law and to enjoin state and local actions that are preempted by federal law.

32.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 over the parallel claims of unconstitutional taking of property, violation of the due process rights and violation of equal protection principles under the California Constitution because they arise out of the same case or controversy as the federal question claims.

33.     Venue is proper in this District pursuant to 28 U.S.C.§ 1391(b)(1) because the City is located within the District.  This Court is also a proper venue pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the District, where the property and business affected by the Ordinance is located.

34.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

7

36087\13079528.1

1  (declaratory judgment), 28 U.S.C. § 1651(a) (injunctive relief), and 42 U.S.C. § 1983 (declaratory

2  and injunctive relief available for Constitutional violations).

3  <center>**INTRADISTRICT ASSIGNMENT**</center>

4      35.    Pursuant to Civil Local Rule 3-5(b) and Civil Local Rule 3-2(c)-(d), there is a basis

5  for assigning this civil action to the San Francisco Division or the Oakland Division, as a

6  substantial part of the events giving rise to the claims occurred in Contra Costa County.

7  <center>**FACTUAL BACKGROUND**</center>

8  **Levin's History and Operations**

9      36.    Levin is a small, family-owned business that has operated in Richmond for more

10  than 37 years.  LRTC is a wholly-owned subsidiary of Levin Enterprises, which is the owner of

11  the real property operated by LRTC as a marine terminal that stores and handles coal, petcoke and

12  recyclable metals.  RPRC provides freight service from interstate rail lines to the LRTC facility.

13      37.    LRTC and RPRC employ more than 60 individuals, many of whom are Richmond

14  residents, and most of whom are members of the Operating Engineers Union Local 3.  Levin also

15  provides other economic benefits to the City and the community as an employer, taxpayer and

16  local business.

17      38.    The LRTC facility is a point of transfer in interstate and foreign commerce for coal,

18  petcoke and recyclable metals, receiving these commodities by rail and truck for transfer to marine

19  vessels for shipment overseas.  Levin and LRTC neither own, distribute nor sell these

20  commodities.  The temporary storage and handling of coal, petcoke and recyclable metals at the

21  LRTC facility is incidental to the transloading of these commodities in interstate and foreign

22  commerce.

23      39.    LRTC has transloaded petcoke for more than 20 years.  During the past six years,

24  transloading of coal and petcoke has averaged more than 80 percent of LRTC's business, with coal

25  alone averaging more than 65 percent of LRTC's business.  During this same period,

26  transportation of coal by rail between interstate rail lines and the LRTC facility has represented

27  approximately 50 percent of RPRC's annual business.

28      40.    The LRTC facility is a legal land use with vested rights to continue existing

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

8

36087\13079528.1

operations.  Prior to 2016, LRTC operated in accordance with zoning under Article 15.04.340.020 of the previous RMC zoning ordinance.  Following the City's 2016 rezoning, new marinas and certain industrial activities require conditional use permits in the Water-Related Industrial zone, where LRTC is located.  RMC, Art. 15.04.204.020 (2016).  Existing facilities are not subject to the conditional use permit requirement unless the use is materially altered or expanded.  RMC, Art. 15.04.606.020.B (2016).  LRTC has not materially altered uses or expanded the area used for coal or petroleum coke storage or handling, consistent with non-conforming use criteria specified by the City.  Therefore, under the 2016 rezoning, LRTC operations are legal non-conforming uses that require no conditional use permit.

41.     As noted above, the owners of the commodities that are prohibited by the Ordinance – Wolverine Fuels in the case of coal and Phillips 66 in the case of petcoke – are solely responsible for production, export and sale, and for arranging the rail and truck deliveries to the LRTC facility and for overseas shipments from the LRTC facility.  The Ordinance impermissibly impairs the contractual relations between Levin, Wolverine Fuels and Phillips 66 for the transloading of these commodities at the LRTC facility.

42.     The high BTU, low-sulfur coal transloaded for Wolverine Fuels is delivered to the LRTC facility by rail from Utah for shipment to Japan, which depends on this source of energy in place of that country's discontinued nuclear energy program following the 2011 Fukushima disaster.  Wolverine Fuels treats the coal with a surfactant or topping agent in Utah, to minimize the potential for dust, prior to shipment by rail to from Utah to the LRTC facility.

43.     The majority of petroleum coke transloaded for Phillips 66 at the LRTC facility is exported for use in manufacturing aluminum, and for titanium dioxide used as a pigment for paint, plastics, sunscreen and food coloring, not as a fuel source.  Phillips 66 treats the petcoke with a dust suppressant prior to shipment by truck from Rodeo to the LRTC facility.

44.     In a letter submitted to the City Council on November 19, 2019, Phillips 66 noted that there are no other marine terminals in the San Francisco Bay Area suitable to fulfill overseas customer requirements for petcoke, and that prohibiting this commodity at the LRTC facility would require Phillips 66 to transport petcoke by truck or rail from Rodeo to a more distant marine

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

9

36087\13079528.1

1    terminal, resulting in significantly increased vehicle and vessel transport miles, traffic congestion,

2    vehicle and vessel fuel consumption, and related emissions.

3        45.    In a letter submitted to the City Council on December 2, 2019, Wolverine Fuels

4    similarly noted that, if the LRTC facility were not available, coal exports to Japan would need to

5    be shipped from Utah through a more distant marine terminal, potentially in Mexico, with

6    increased emissions resulting from much longer rail transport; or if Wolverine Fuels could not find

7    a suitable alternative marine terminal, Japan would replace the high BTU, lower sulfur coal with

8    lower quality coal on the international market.  Wolverine Fuels noted that either scenario would

9    lead to increased greenhouse gas ("GHG") emissions and other environmental impacts.

10       46.    Although the United States domestic market for coal has declined, the export

11   market for coal remains strong.  Congress made American-mined coal exports a national priority

12   more than two decades ago and directed the Commerce Department to prepare plans for

13   encouraging these exports.  See 42 U.S.C. § 13367.

14       47.    Levin is informed and believes and thereon alleges that the true objective of

15   proponents of the Ordinance is to reduce global climate change affected by the burning of fossil

16   fuels, as asserted in early drafts of the Ordinance and commentary by the Mayor of Richmond,

17   Councilmember Martinez, and others.  However, neither coal nor petcoke is burned at the LRTC

18   facility.  The LRTC facility is merely a point of transfer for transport of these commodities in

19   interstate and foreign commerce, and the City has no jurisdiction to regulate the use of these

20   commodities outside the City's boundaries.[4]

21       48.    Although the City's Agenda Report states that prohibiting coal and petcoke at the

22   LRTC facility will mean export of these commodities will "shift from one West Coast port to

23   another," actions by state and local governments and environmental groups are seeking to block

24   shipment of these commodities from other existing and proposed West Coast marine terminals.

25

26   [4] Furthermore, "[i]t is facially ridiculous to suggest that this one operation resulting in
     consumption of coal in other countries will, in the grand scheme of things, pose a substantial
27   global warming-related danger to people in Oakland."  *Oakland Bulk & Oversized Terminal, LLC
     v. City of Oakland*, 321 F.Supp.3d 986, 1008 (N.D. Cal. 2018), *appeal pending*, No. 18-16141 (9th
28   Cir.).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF          10          36087\13079528.1

*See, e.g., Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 321 F.Supp.3d 986, 1008 (N.D. Cal. 2018), *appeal pending*, No. 18-16141 (9th Cir.); *Lighthouse Resources, Inc. v. Inslee*, No. 3:18-cv-05005-RJB (W.D. Wash. 2018), *appeal pending*, No. 2019-35415 (9th Cir.). Ironically, if this campaign were successful, these commodities would be shipped through more distant marine terminals for overseas export, such as terminals in Mexico or Canada, resulting in increased GHG emissions and other environmental impacts.

49.     LRTC has measures in place to address potential dust emissions, including maintaining an enclosed rail car unloading facility, covered conveyors, wind buffers around storage areas, water misters at transfer points and storage areas, and daily use of regenerative air sweeping equipment within the facility and on adjacent parking areas and roads.  LRTC and RPRC have reduced other potential emissions by converting conveyors to electric power and upgrading mobile equipment, cranes and locomotives to Tier 4 engines.

50.     LRTC is in compliance with the air permit issued by BAAQMD for dry bulk material and diesel emissions, the CARB permit for mobile equipment diesel emissions, and the SWRCB General Permit for Storm Water Discharges Associated with Industrial Activities, issued pursuant to the federal Clean Water Act.

51.     The LRTC facility is well-maintained, visually-screened and landscaped, as shown in the street view photograph below, and is located in a highly industrial area of Richmond.



Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

11

36087\13079528.1

52.     The LRTC facility is in the foreground of the aerial photograph below and is flanked (left to right) by the Interstate 580 freeway, the Sims Metal recycling facility, the TransMontaigne tank farm and terminal, and the Eagle Rock Aggregates facility.  Not visible in this photograph are the National Gypsum facility, tank farms and terminal across the Santa Fe Channel to the south of LRTC, and marine contractor Manson Construction and additional tank farms and terminals across the Lauritzen Canal to the west of the LRTC facility.



53.     The assertion in the Ordinance that storage and handling of coal and petcoke at the LRTC facility poses adverse impacts for property values, aesthetics and economic interests in Richmond is not supported by the record.

54.     The assertion that the Ordinance is "necessary for public health and safety as it will reduce particulate matter emissions and toxic exposure from coal and petroleum coke storage" and for "protecting the public from health hazards of coal and petroleum coke storage and handling" at the LRTC facility is not supported by the record.

55.     The assertion by City staff, as reflected in the Agenda Report accompanying the Ordinance, that "the three year amortization period provided in the ordinance will be appropriate" to allow Levin to "profitably transition to handling other commodities," or obtain a "fair economic return" on investment if it is unable to do so, is not supported by the record.

**History and Record Relating to the Ordinance**

56.     In December 2018, City Councilmember Eduardo Martinez submitted an Agenda

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

12

36087\13079528.1

Item Request and Agenda Report for the December 18, 2018 City Council meeting, proposing an ordinance prohibiting the storage and handling of coal and petcoke. The December 18, 2018 Agenda Request asserted health risks from fugitive coal and petcoke dust, as well as "climate change" and the need to "not only protect the health of our community but also the health of our planet," as grounds for the Ordinance. The December 18, 2018 Agenda Report similarly asserted health effects from fugitive coal and petcoke dust and, referenced the City's Greenhouse Gas Emissions Reduction goal to "[r]educe coal burning in the city, state, country, and world," and stated that the City "should do all that is possible to limit the amount of fugitive coal and petcoke dust and reduce the burning of aforementioned items."

57.     On April 23, 2019, the City Council referred the Ordinance to the City's Planning Commission, noting in the Agenda Report for the April 23, 2019 City Council meeting that the "only existing facility in Richmond which stores, handles or exports coal or petcoke is the Levin Richmond Terminal at 402 Wright Avenue."

58.     On July 18, 2019, the City's Planning Commission conducted a public hearing concerning the proposed Ordinance. The proposed Ordinance asserted that it was intended to "protect and promote the health, safety, and welfare of the City's citizens, visitors, and workers by reducing the release of pollutants into the environment as a result of coal and petroleum coke storage and handling," to "reduce the public health, safety, and welfare impacts (including, without limitation, adverse impacts to property values, aesthetics, and economic interests) caused by the storage and handling of coal and petroleum coke," and to "protect[] the public from the health hazards of coal and petroleum coke storage and handling."

59.     The accompanying Resolution asserted that the proposed Ordinance was needed to address health risks from "fine particulate pollution ($PM_{2.5}$ or smaller)," that may be emitted from facilities that handle or store coal and petcoke, that "coal and petroleum coke dust and leacheates can pollute waterways," and that the City "has received complaints from members of the community regarding fugitive coal dust from existing facilities." The accompanying Agenda Report acknowledged that the proposed Ordinance was directed at LRTC, admitting that the LRTC facility is the only property that stores and handles coal and petcoke in Richmond.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

13

36087\13079528.1

60.     The materials provided to the Planning Commission included a scientific analysis by STI, demonstrating that existing data "does not support the conclusion that the Terminal is a source of fugitive $PM_{2.5}$ coal or petcoke emissions that pose health risks or other impacts." Sonoma Technology, Inc., *Assessment of the State of Data and Science Underlying the Proposed Ordinance Prohibiting Coal and Petcoke Storage and Handling in Richmond*, at 23  (July 12, 2019) ("Initial STI Assessment").  The Initial STI Assessment was submitted to the Planning Commission on behalf of Levin on July 17, 2019.

61.     Following nearly four hours of public comments and extensive written materials, on July 18, 2019, the City's Planning Commission rejected the staff's proposed resolution providing for a Planning Commission recommendation that the City Council adopt the Ordinance. Instead, the Planning Commission voted unanimously (7-0) to adopt Resolution 19-29, recommending that City Council "not adopt the proposed ordinance" and stating:

> [T]he Richmond Planning Commission does *not* find that the storage and handling of coal and petroleum coke is an undesirable land use; and . . . recommends that the City Council *not* adopt an ordinance . . . prohibiting the storage and handling of coal and petroleum coke, . . . *cannot* find that the proposed ordinance is necessary for public health, safety and welfare, and expressed its position that *additional study is needed* to better understand the air quality impacts of operations at existing sites . . . [and] the potential economic impacts to the City of Richmond . . . (emphasis added)

62.     The City has not performed the economic impact report recommended by the Planning Commission concerning the effect of the Ordinance on business, jobs and the community.  Moreover, as noted above, the Supplemental STI Assessment of air monitoring data shows the LRTC facility is *not* a source of harmful fugitive dust emissions.

63.     Specifically, following the Planning Commission's July 18, 2019 adoption of Resolution 19-29, STI completed an evaluation of preliminary screening data from $PM_{2.5}$ air monitoring upwind and downwind from coal and petcoke operations at the LRTC facility.  The evaluation showed "no statistically significant difference in $PM_{2.5}$ concentrations immediately upwind and downwind at the Terminal.  Therefore, combined with the ambient data from other nearby monitoring locations discussed in [STI's] initial report (Chinkin 2019), the results of this preliminary screening study support the conclusion that the Terminal is not a source of fugitive

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

14

36087\13079528.1

1  PM$_{2.5}$ emissions." Supplemental STI Assessment, at 2.

2      64.     The City ignored the unanimous recommendation of the Planning Commission, the

3  Supplemental STI Assessment, the BRG Economic Evaluation and other evidence and placed the

4  Ordinance on the City Council's December 3, 2019 agenda. Following more than three hours of

5  public comments, including comments on behalf of Levin, the City Council closed public

6  comments and continued the First Reading on the Ordinance to January 14, 2020. The vote at the

7  First Reading was for approval of the Ordinance and, at the Second Reading on February 4, 2020,

8  the City Council approved the Ordinance.

9      65.     The City's adoption of the Ordinance, the purported purpose of which is

10  "protecting the public from health hazards of coal and petroleum coke storage and handling,"

11  ignores both the unanimous recommendation of the Planning Commission to not adopt the

12  proposed Ordinance, and the Supplemental STI Assessment showing Levin is *not* a source of

13  harmful fugitive dust emissions.

14      66.     The City's adoption of the Ordinance also ignores that there is an ongoing air

15  monitoring program, funded by CARB pursuant to AB 617, that will determine and address – with

16  community input – areas of concern and contributing sources of air pollution in Richmond. By

17  letter dated July 5, 2018, BAAQMD advised the Mayor and the City Council that the AB 617

18  study will evaluate concerns raised by the community, including evaluating potential pollutants at

19  and around the LRTC facility, with input from the Richmond community Steering Committee

20  established under AB 617.

21      67.     In a February 12, 2020 interview concerning the Ordinance, Richmond Mayor Butt

22  acknowledged the lack of evidence showing that the LRTC facility is a source of fugitive coal dust

23  emissions and the ongoing monitoring program that will provide information "in the future."[5]  The

24  City Council proceeded with adoption of the Ordinance without waiting for the information

25

26  [5]  Richmond Mayor Butt stated in the February 12, 2020 KCPW interview that "we don't know
27  whether [dust] is coming from coal trains or the Levin operation or both," and that "there's an ongoing monitoring program that should have that information in the future."
28  https://kcpw.org/blog/in-the-hive/2020-02-13/the-latest-battle-brewing-over-the-future-of-utahs-coal-industry/.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

referenced by Mayor Butt, and with disregard for the scientific evidence in the record showing that the LRTC facility is not a source of harmful fugitive dust emissions.

68.     Additionally, as noted above, following the Planning Commission's July 18, 2019 adoption of Resolution 19-29, the BRG Economic Evaluation determined that (1) the Ordinance amortization period will not allow LRTC to avoid significant economic harm, given the nature of the facility and the market for suitable alternative commodities; (2) the Ordinance criteria for seeking to extend the amortization period fails to take account of the nature of the facility and the market; and (3) the Ordinance is likely to put LRTC out of business.  BRG Economic Evaluation, at 3.

69.     Specifically, after reviewing current and reasonably foreseeable market conditions, numerous potential alternative commodities and the nature of the facility, Drs. Danner and Serwin concluded that there is no current, economically viable market for other commodities suitable for transloading at the LRTC facility.  As the economists stated, the greatest economic injury to LRTC is not the loss of value of facilities, property and equipment, but rather "the lost going-concern business value from losing profitable future revenue streams from coal and petcoke tonnage LRTC would not be able to replace," which is "ignored entirely by the Ordinance", and which renders the three-year amortization period "economically unsupportable and arbitrary." BRG Economic Evaluation, at 5-6.

70.     The BRG Economic Evaluation also concluded that the Ordinance criteria for applying for an extension of the amortization period are "misguided and fail to take account of the nature of the facility and the market."  These criteria are similarly "limited to evaluating factors related to potential LRTC lost asset value" and "fail to consider whether LRTC really can find suitable alternative commodities in comparable tonnages if coal and petcoke were prohibited, given the nature of this particular transloading facility and the market for suitable commodities." BRG Economic Evaluation, at 3 and 6.

71.     The assertion by City staff, as reflected in the December 3, 2019 Agenda Report, that "the three-year amortization period provided in the ordinance will be appropriate" to allow Levin to "profitably transition to handling other commodities," or obtain a "fair economic return"

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

16

36087\13079528.1

1    on investment if it is unable to do so, is not supported by the record and is, in fact, contradicted by

2    the BRG Economic Evaluation.

3         72.    The City Council's adoption of the Ordinance also ignores comments submitted by

4    Wolverine Fuels and Phillips 66, demonstrating that prohibiting storage and handling of coal and

5    petcoke at LRTC will increase rail, truck and marine vessel transport distances and emissions, fuel

6    consumption, highway and street traffic, and GHG emissions, and has the potential to cause other

7    environment impacts.

8         73.    The Agenda Report for the December 3, 2019 City Council meeting tracked the

9    language of the Agenda Report for the July 18, 2019 Planning Commission meeting regarding the

10   purpose of the Ordinance, acknowledged the Planning Commission's recommendation that the

11   City Council not adopt the Ordinance, and asserted that the Planning Commission made this

12   recommendation "because it could not make all of the required findings."  In fact, the Planning

13   Commission unanimously recommended *against* adoption of the Ordinance because it "*cannot*

14   find that the proposed ordinance is necessary for public health, safety and welfare," and because

15   "*additional study is needed* to better understand the air quality impacts of operations at existing

16   sites."  (emphasis added)  The LRTC is the "existing site" under the Ordinance.

17        74.    The Ordinance accompanying the December 3, 2019 Agenda Report was

18   unchanged in asserted findings and purpose from the proposed Ordinance that had been rejected

19   by the Planning Commission.  The Ordinance again asserted that it was needed to address health

20   risks from "fine particulate pollution ($PM_{2.5}$ or smaller)," that may be emitted from facilities that

21   handle or store coal and petcoke, that "coal and petroleum coke dust and leacheates can pollute

22   waterways;" that the City "has received complaints from members of the community regarding

23   fugitive coal dust from existing facilities;" that the Ordinance was intended to "protect and

24   promote the health, safety, and welfare of the City's citizens, visitors, and workers by reducing the

25   release of pollutants into the environment as a result of coal and petroleum coke storage and

26   handling," to "reduce the public health, safety, and welfare impacts (including, without limitation,

27   adverse impacts to property values, aesthetics, and economic interests) caused by the storage and

28   handling of coal and petroleum coke;" and was needed to "protect[] the public from the health

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

17

36087\13079528.1

1  hazards of coal and petroleum coke storage and handling."

2      75.    The Ordinance also expressly states:

3  This Article is not intended to, and shall not be interpreted to regulate or applied to
prohibit the transportation of coal and/or petroleum coke, for example, by train or

4  marine vessel, including without limitation through the City of Richmond or to or
from a coal or petroleum coke storage and handling facility.

5

6      76.    Yet, that is *precisely* the effect of the Ordinance, which would prohibit storage and

7  handling of coal and petcoke at LRTC, which is merely a point of transfer of these commodities in

8  interstate and foreign commerce.  The unavailability of LRTC for transloading would directly

9  affect rail, truck and marine vessel operations and overseas shipments, as demonstrated by the

10  Phillips 66 and Wolverine Fuels letters to the City Council, necessitating redirection of shipments

11  and transportation of these commodities to more distant marine terminals to meet customer needs,

12  or discontinuation of such rail, truck and overseas shipments.

13      77.    Like the July 18, 2019 Agenda Report for the Planning Commission, the December

14  3, 2019 Agenda Report for the City Council's consideration of the Ordinance acknowledged that

15  the proposed Ordinance was directed solely at LRTC and again admitted that the LRTC facility is

16  the only property that stores and handles coal and petcoke in Richmond.

17      78.    The City Council held a public meeting concerning the Ordinance on December 3,

18  2019.  Following more than three hours of public comments, the City Council closed public

19  comments and continued the First Reading on the Ordinance to January 14, 2020.  The vote at the

20  First Reading was for approval of the Ordinance and, at the Second Reading on February 4, 2020,

21  the City Council approved the Ordinance.

22      79.    The City relied on anecdotal information and microscopic examination of dust

23  samples from surfaces in southwestern Richmond to attempt to support the need for the Ordinance

24  and justify assertion of police power to "protect[] the public from the health hazards of coal and

25  petroleum coke storage and handling" at the LRTC facility.  The microscopic analysis of dust

26  samples, provided to the Planning Commission and the City Council, does not identify the LRTC

27  facility as the source of dust in the samples.  Additionally, the microscopic analysis was shown in

28  the Initial STI Assessment to be scientifically unreliable, not probative of any ongoing source, and

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

1   not indicative of harmful, respirable particles.  Moreover, the City's information is contradicted by

2   the evaluation by STI of actual air monitoring of fugitive $PM_{2.5}$ emissions upwind and downwind

3   of coal and petcoke operations at the LRTC facility.

4          80.     Specifically, the Initial STI Assessment observed that a report commissioned by

5   Mayor Butt, McCrone Associates, *Examination of Samples from Richmond, California for Coal*

6   *Dust* (November 9, 2018), fails to identify the LRTC facility as the source of the dust samples

7   purportedly collected from surfaces in southwest Richmond, fails to distinguish the physical and

8   chemical characteristics of coal dust from other visually similar particles, such as black carbon and

9   diesel particulate, and fails to identify other sources of particulate matter.  Initial STI Assessment,

10   at 19-21.

11          81.     Additionally, Initial STI Assessment noted that although the particle size is not

12   identified in the McCrone report, based on the microscopy methodology used in the analysis, the

13   samples appear to consist of particles that are much larger than $PM_{2.5}$ and therefore not associated

14   with potential health risks.  The report also fails to provide a scientifically acceptable sampling

15   protocol for collection and handling or chain of custody for the samples.  Initial STI Assessment,

16   at 20-21.

17          82.     The Initial STI Assessment also observed that the McCrone report used a low-

18   powered stereomicroscope that is insufficient for accurately characterizing the size of the

19   particulate matter and is scientifically unsuitable for distinguishing coal and petcoke dust from

20   soot from diesel vehicle exhaust, tire and brake wear, re-suspended road dust and other visually

21   similar particulate matter.  Initial STI Assessment, at 19-20.

22          83.     In addition to reviewing the McCrone report, the Initial STI Assessment also

23   reviewed ambient data for $PM_{2.5}$ at existing monitoring locations in Richmond, including data

24   from air monitoring downwind from LRTC under prevailing wind conditions.  Although other

25   monitoring locations showed occasional exceedances of National Ambient Air Quality Standards

26   ("NAAQS"), monitoring at the downwind location showed no NAAQS exceedances.  This actual

27   monitoring data demonstrates that, contrary to the anecdotal media reports and complaints

28   referenced in the Agenda Report and Ordinance, the LRTC facility is not a source of harmful

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

19

36087\13079528.1

1    fugitive dust emissions.  Initial STI Assessment, at 6-14.

2           84.    For these and other reasons, the Initial STI Assessment concluded that the proposed

3    Ordinance is not supported by existing, scientifically valid data:

4           The McCrone analysis does not demonstrate the existence of coal dust in the
            samples submitted by residents, nor does it support the need for an ordinance
5           singling out the Terminal as presenting health risks from fugitive coal and petcoke
            dust emissions.  Similarly, the existing monitoring data for Richmond does not
6           support the conclusion that the Terminal is a source of fugitive $PM_{2.5}$ coal or
            petcoke emissions that pose health risks or other impacts.

7
            Initial STI Assessment, at 23.
8

9           85.    The Sierra Club subsequently submitted microscopic analyses of additional

10   samples of dust purportedly collected from surfaces in southwest Richmond by Sierra Club

11   personnel, and analyzed by Microvision Northwest Forensic Consulting, to the City Council.  In

12   addition to questions about sampling protocols, these analyses similarly do not identify the LRTC

13   facility as the source of dust in the samples, and do not provide a scientific basis for concluding

14   that LRTC is a source of fugitive coal or petcoke dust emissions.

15          86.    STI has stated that scientific differentiation of coal dust from soot from diesel

16   vehicles, tire and brake wear, re-suspended road dust and other visually similar particulate matter

17   requires chemical analysis, not microscopic analysis; the locations where the samples were

18   reportedly collected are near many industrial sources and a freeway; the reported particle sizes are

19   orders of magnitude larger than $PM_{2.5}$ and therefore have no relevance to health risks; and the

20   volume percentage calculations are skewed by the size of the particles.

21          87.    By letter to the Richmond Mayor and City Council, dated July 5, 2018, BAAQMD

22   Executive Officer/APCO Jack Broadbent similarly noted the large number of current and

23   historical sources of particulate emissions in Richmond and described what would be required for

24   a valid study of potential emissions, including the need to implement methodologies to identify

25   ongoing sources of airborne emissions, differentiate among sources of particulate matter,

26   scientifically speciate coal or petcoke from other types of elemental carbon and other particulate

27   matter, and distinguish between re-entrained coal or petcoke dust that was deposited historically

28   versus any ongoing sources of fugitive emissions.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                          20                          36087\13079528.1

88.     The BAAQMD letter noted that there are numerous sources of particulate emissions in southwestern Richmond, including "high volume freeways and roadways," "on and off-road diesel and gasoline combustion, an aggregate facility, a gypsum facility, a concrete batch plant and a metal scrap facility."  BAAQMD letter, at 1 and 3 (July 5, 2018).

89.     The McCrone and Microvision reports do not reflect the proper methodologies or provide a valid scientific basis for concluding that the Ordinance is needed to "protect[] the public from the health hazards of coal and petroleum coke storage and handling" at the LRTC facility.

90.     To the contrary, as stated in the Supplemental STI Assessment, based on actual air monitoring upwind and downwind at the LRTC facility, the scientific evidence demonstrates that the LRTC facility "is not a source of fugitive $PM_{2.5}$ emissions."  *Id.*, at 19.

91.     Neither the Initial STI Assessment, the Supplemental STI Assessment, nor the BRG Economic Evaluation were addressed in the City's Agenda Reports for the December 3, 2019, January 14, 2020 or February 4, 2020 City Council meetings.

92.     The City also failed to consider less restrictive means to achieve the purported purposes of the Ordinance.  Instead, subject to the arbitrary, capricious and unsupported amortization period, the Ordinance operates as a prohibition on coal and petcoke storage and handling at the LRTC facility, and without any consideration of existing or potential mitigation of the purported public health and safety concerns, much less any credible scientific basis for the purported public health and safety concerns asserted in the Ordinance.

93.     The Ordinance is wholly lacking in the rational, factual support required for a valid exercise of police powers, would directly violate Constitutional protections and guarantees, is preempted by federal law, singles out LRTC, and is arbitrary, capricious and unlawful.

94.     An actual controversy has arisen and now exists between Levin and the City concerning their respective rights, obligations and duties, requiring this Court to adjudicate those respective rights and duties.  Levin contends that the City's Ordinance lacks legal merit and factual support, and is unconstitutional, federally preempted, unlawful and unenforceable, as set forth herein.  Levin is informed and believes that the City contends the Ordinance is valid and is not preempted, and contends that prohibiting storage and handling of coal and petcoke is

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

21

36087\13079528.1

1   necessary to protect the public's health and is a valid exercise of police power.

2       95.     Levin has exhausted administrative remedies by objecting to the Ordinance, and

3   presenting written and verbal comments and materials relating to the Ordinance, in proceedings

4   before the City's Planning Commission and the City Council.

5       96.     As a legal nonconforming use, Levin is not entitled to seek an exception under the

6   provisions of the Ordinance.  Levin has also already presented the BRG Economic Evaluation to

7   the City, demonstrating that the three-year amortization period is arbitrary and inadequate, and

8   that the criteria for seeking an extension under the Ordinance is inapplicable and fails to take

9   account of the unique nature of the LRTC marine terminal, and the market and economic viability

10  of potential alternative commodities.

11      97.     Additionally, the City Council's rejection of the Planning Commission's

12  unanimous recommendation to not adopt the Ordinance shows that seeking an extension from the

13  Planning Commission, subject to review by the City Council, would be futile.

14      98.     Levin's interests will be materially, substantially, and irreparably harmed by the

15  Ordinance.  Accordingly, Levin seeks declaratory and injunctive relief as set forth in this

16  Complaint.

17                              **CLAIMS FOR RELIEF**

18                           **FIRST CAUSE OF ACTION**

19      **(Unconstitutionality Under the Commerce Clause (U.S. Const. Art. I, § 8))**

20      99.     Levin realleges and incorporates by reference the allegations set forth in paragraphs

21  1 through 98, above, as if fully set forth herein.

22      100.    The Commerce Clause prohibits state and local governments from impermissibly

23  regulating interstate and foreign commerce.  The City is prohibited from regulating conduct

24  outside the City's borders or placing an undue burden on interstate commerce.  The Foreign

25  Commerce Clause also prohibits Defendants from regulating foreign commerce.

26      101.    The LRTC facility is a point of transfer for coal and petcoke shipments in interstate

27  and foreign commerce.  The Ordinance forces Levin to discontinue coal and petcoke storage and

28  handling.  Consequently Wolverine Fuels and Phillips 66 would need to either discontinue sales to

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    22                        36087\13079528.1

foreign customers or attempt to find another suitable marine transloading facility with deep water berths, and rail and truck access for the export of coal and petcoke to foreign countries.  Such a facility does not currently exist in the San Francisco Bay Area.  The Ordinance restricts interstate and foreign shipments, facially and as applied, by eliminating this essential transfer point for these commodities and by redirecting and restricting transport of these commodities.

102.     The Ordinance overtly discriminates against interstate and foreign commerce, facially and as applied, because it regulates transactions beyond the City's borders.  The commodities at issue do not originate in the City and are not distributed in the City.

103.     The Ordinance would prohibit all shipments of coal and petcoke through the LRTC facility, redirecting rail and truck transport and potentially preventing export of these commodities, burdening and obstructing the federal interest in a uniform system of transportation and exportation of commodities such as coal and petcoke.

104.     The burden on interstate and foreign commerce imposed by the Ordinance, including obstructing rail shipments of coal from Utah to the LRTC facility, redirecting rail and truck shipments of coal and petcoke to more distant marine terminals, obstructing shipments of coal and petcoke from the LRTC facility to international destinations, or preventing such shipments altogether, are excessive and outweigh any purported local benefits.  In fact, the record shows that there is no valid basis for the City's exercise of police power or legitimate local interest that would justify the excessive burden posed by the Ordinance for interstate and foreign commerce.

105.     Such discrimination against and burden upon interstate rail shipments and international marine shipments, without a valid exercise of police power and a legitimate local interest, is impermissible under the Commerce Clause.  U.S. Const. art. I, § 8.

106.     Thus, the Ordinance unconstitutionally interferes with and obstructs interstate and foreign transactions that occur wholly outside of the City's borders.

107.     Levin's interests will be materially, substantially, and irreparably harmed by the Ordinance.  Accordingly, Levin seeks declaratory and injunctive relief based on a declaration that the Ordinance was enacted in violation of, and is unconstitutional, under the Commerce Clause.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

23

36087\13079528.1

Wherefore, Levin prays for judgment as set forth below.

## SECOND CAUSE OF ACTION

### (Preemption Under the Interstate Commerce Commission Termination Act)

108.    Levin realleges and incorporates by reference the allegations set forth in paragraphs 1 through 107, above, as if fully set forth herein.

109.    The Interstate Commerce Commission Termination Act ("ICCTA") expressly and impliedly preempts the Ordinance.  The ICCTA established the Surface Transportation Board ("STB"), which has jurisdiction over transportation by rail carrier that is "only by railroad" or "by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment." 49 U.S.C. §§ 10501(a)(1)(A) and (B).

110.    When the transportation is between "a State and a place in the same or another State as part of the interstate rail network" or "the United States and a place in a foreign country," STB has *exclusive* jurisdiction.  *Id.* at § 10501(a)(2)(A) and (F); 49 U.S.C. § 10501(b).

111.    The ICCTA expressly preempts any state or local regulation of matters that fall under the STB's exclusive jurisdiction, including operation of interstate rail lines.  The ICCTA also impliedly preempts any action that unreasonably interferes with rail transportation.

112.    The storage, handling and transloading of coal and petcoke through the LRTC facility is transportation between "a State and a place in the same or another State as part of the interstate rail network" or "the United States and a place in a foreign country," over which STB has exclusive jurisdiction.

113.    Specifically, the interstate transport of coal from Utah to the LRTC facility occurs on Union Pacific Railroad's rail lines from "another State as part of the interstate rail network." The rail cars are transported by RPRC from the Union Pacific Railroad rail lines in Richmond to the LRTC facility.  The shipment of coal and petcoke from the LRTC facility is by marine vessel is between "the United States and a place in a foreign country."  The Ordinance impermissibly regulates and unjustifiability restricts and forecloses those interstate rail shipments from Utah as well as the shipment to foreign destinations by marine vessel.

114.    The Ordinance's prohibition of storage and handling of coal at LRTC affects Union

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

36087\13079528.1

1  Pacific's rail operations by requiring transport of Wolverine Fuel's coal to a more distant marine

2  terminal, or discontinuation of such coal shipments to Japan.  The Ordinance's prohibition of

3  storage and handling of coal at LRTC also affects Plaintiff RPRC's rail operations, approximately

4  50 percent of which involve transport of coal, because enforcement of the Ordinance would

5  impermissibly regulate and unjustifiability restrict and foreclose RPRC from continuing this

6  current use of its rail lines.

7       115.    The ICCTA expressly and impliedly preempts the Ordinance, which affects and

8  unreasonably interferes with rail operations that are the subject of exclusive federal jurisdiction,

9  and the Ordinance is therefore invalid and may not be enforced.

10       116.    For the foregoing reasons, Levin's interests will be materially, substantially, and

11  irreparably harmed by the Ordinance.  Accordingly, Levin seeks declaratory and injunctive relief

12  based on federal preemption of the Ordinance under the ICCTA.

13       Wherefore, Levin prays for judgment as set forth below.

14                      **THIRD CAUSE OF ACTION**

15  **(Unconstitutional Taking of Property (U.S. Const. Amend. V; Cal. Const. Art. I, § 19))**

16       117.    Levin realleges and incorporates by reference the allegations set forth in paragraphs

17  1 through 116, above, as if fully set forth herein.

18       118.    Levin has a vested right to continue existing operations at the LRTC facility.  Prior

19  to 2016, Richmond Zoning Ordinance's permitted uses encompassed all of LRTC's uses.

20  Following the City's 2016 rezoning, new marinas and certain industrial activities in the area where

21  LRTC is located now require conditional use permits in the Water-Related Industrial zone.  *Id.*

22  (citing RMC Art. 15.04.204.020 (2016)).  However, because Levin's operations have not changed

23  or intensified operations since rezoning, LRTC is a legal nonconforming land use.  *Id.* (citing arts.

24  15.04.606.040.A and C.).

25       119.    The Ordinance is not based on a valid exercise of police power because there is no

26  evidence showing that the Ordinance will protect public health or the environment.

27       120.    The Ordinance deprives Levin of the economically viable use of its property and

28  business interests without providing Levin with just compensation or a reasonable amortization

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    25                    36087\13079528.1

1    period to allow recovery of the investment or conversion to other uses, if such conversion were

2    economically feasible.

3         121.    The BRG economic analysis found, and the record establishes, that "LRTC is a

4    unique marine facility and its operations (the transloading of coal, petcoke and scrap metal) are

5    limited by market conditions for these and other dry bulk commodities."  BRG Economic

6    Evaluation, at 4.  After reviewing current and reasonably foreseeable market conditions, numerous

7    potential alternative commodities, and the nature of the facility, the record showed there are no

8    alternative, economically viable commodities to replace coal and petcoke at the LRTC facility

9    within the three year amortization period or any reasonably foreseeable period thereafter.  The

10   record demonstrates that the Ordinance is likely to put Levin out of business.

11        122.    The Ordinance provides criteria for seeking an exception to the Ordinance,

12   however the Ordinance makes the exception unavailable to a legal "nonconforming use" and

13   therefore the exception is unavailable to Levin.  The criteria for the exception, even if applicable,

14   are also inadequate, inapplicable, and fail to take account of the nature of the LRTC facility and

15   the market for suitable alternative commodities to replace coal and petcoke.

16        123.    The three year amortization period under the Ordinance is arbitrary, capricious,

17   unsupported and inadequate.

18        124.    The criteria for seeking an extension of the amortization period was evaluated by

19   the BRG economists and found to be inadequate and inapplicable, failing to take account of the

20   unique nature of the LRTC facility and the market for suitable alternative commodities.  This

21   criteria is arbitrary, capricious, unsupported and inadequate.

22        125.    The Ordinance constitutes an unlawful taking of Levin's property and business

23   interests, in violation of the United States Constitution and the California Constitution.  U.S.

24   Const. amend. V; Cal. Const. art. I, § 19.

25        126.    Levin's interests will be materially, substantially, and irreparably harmed by the

26   Ordinance.  Accordingly, Levin seeks declaratory and injunctive relief based on a declaration that

27   the Ordinance was enacted in violation of, and is unconstitutional, under the Takings Clause of the

28   United States Constitution, and the California Constitution.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

26

36087\13079528.1

1    Wherefore, Levin prays for judgment as set forth below.

2    **FOURTH CAUSE OF ACTION**

3    **(Violation of Due Process Rights under the United States Constitution**

4    **and the California Constitution; 42 U.S.C. § 1983)**

5    127.    Levin realleges and incorporates by reference the allegations set forth in paragraphs

6    1 through 126, above, as if fully set forth herein.

7    128.    Under the United States Constitution and the California Constitution, the City may

8    not deprive Levin of property rights without due process of law.  U.S. Const. amend. XIV, § 1;

9    Cal. Const. art. I, § 7, subd. (a).

10    129.    Arbitrary or irrational governmental action that infringes on a property owner's

11    rights violates substantive constitutional due process.  Here, the City has admitted that the LRTC

12    facility is the only property affected by the Ordinance.  The City arbitrarily interfered with Levin's

13    property rights by enacting the Ordinance without a rational basis, credible evidence or

14    justification to support the asserted purpose "protecting the public from the health hazards of coal

15    and petroleum coke storage and handling" at the LRTC facility.

16    130.    There are numerous sources of particulate matter emissions in Richmond that are

17    not affected by the Ordinance.  Actual air monitoring evaluated by STI shows that the LRTC

18    facility is not a source of fugitive $PM_{2.5}$ dust emissions.

19    131.    Without a valid basis for exercise of police power, and without regard for other

20    sources of airborne particulate matter, the Ordinance violates Levin's due process protections

21    under the United States Constitution and the California Constitution.

22    132.    Levin's interests will be materially, substantially, and irreparably harmed by the

23    Ordinance.  Accordingly, Levin seeks declaratory and injunctive relief based on a declaration that

24    the Ordinance was enacted in violation of, and is unconstitutional, under the Due Process Clause

25    of the United States Constitution, and the California Constitution.

26    Wherefore, Levin prays for judgment as set forth below.

27    / / /

28    / / /

Farella Braun + Martel LLP
235 Montgomery Street, 17ᵗʰ Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

27

36087\13079528.1

**FIFTH CAUSE OF ACTION**

**(Violation of Equal Protection Principles under the United States Constitution**

**and the California Constitution; 42 U.S.C. § 1983)**

133.    Levin realleges and incorporates by reference the allegations set forth in paragraphs 1 through 132, above, as if fully set forth herein.

134.    Under the United States Constitution and the California Constitution, the equal protection clauses of the United States and California Constitutions do not allow the City to treat similarly situated properties and businesses differently.  U.S. Const. amend. XIV, § 1; Cal. Const. art. I, § 7, subd. (a).

135.    Arbitrary or irrational governmental action that infringes on a property owner's rights violates equal protection guarantees.  Here, the City has admitted that the LRTC facility is the only property affected by the Ordinance.  The City has singled out LRTC and arbitrarily interfered with Levin's property rights by enacting the Ordinance without a rational basis, credible evidence or justification to support the asserted purpose "protecting the public from the health hazards of coal and petroleum coke storage and handling" at the LRTC facility, or other credible evidence to justify the purported need for the Ordinance.

136.    Furthermore, as set forth in the July 5, 2018 BAAQMD letter, there are numerous sources of particulate matter emissions in Richmond that are not affected by the Ordinance. Actual air monitoring evaluated by STI shows that the LRTC facility is not a source of harmful fugitive dust emissions.  The Ordinance impermissibly imposes restrictions on the LRTC facility that are not imposed on similarly situated properties and businesses.

137.    Without a valid basis for exercise of police power, and without regard for other sources of airborne particulate matter, the Ordinance violates equal protection principles under the United States Constitution and the California Constitution.

138.    Levin's interests will be materially, substantially, and irreparably harmed by the Ordinance.  Accordingly, Levin seeks declaratory and injunctive relief based on a declaration that the Ordinance was enacted in violation of, and is unconstitutional, under the Equal Protection Clause of the United States Constitution, and the California Constitution.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

28

36087\13079528.1

Wherefore, Levin prays for judgment as set forth below.

## SIXTH CAUSE OF ACTION

### (Unconstitutional Impairment of Contractual Relations

### Under the United States Constitution (U.S. Const., Art. 1, § 10)); 42 U.S.C. § 1983)

139.    Levin realleges and incorporates by reference the allegations set forth in paragraphs 1 through 138, above, as if fully set forth herein.

140.    The Ordinance violates the Impairments Clause of the United States Constitution, Article 1, § 10, which prohibits local laws or ordinances that impair the obligation of contracts.

141.    Levin has contractual relations with Wolverine Fuels and Phillips 66 for transloading, including storage and handling, of coal and petcoke, respectively, at the LRTC facility, shipped in interstate and foreign commerce.

142.    By prohibiting storage and handling at the LRTC facility, and thereby precluding shipment and export of coal and petcoke through the LRTC facility, the Ordinance impairs those contractual relationships and prevents Levin from meeting contractual obligations to Wolverine Fuels and Phillips 66.

143.    The record shows that there is no valid basis for the City's exercise of police power or legitimate local interest that would justify the impairment of Levin's contractual relations imposed by the Ordinance.

144.    The City also failed to consider less restrictive means to achieve the purported purposes of the Ordinance.  Instead, subject to the arbitrary, capricious and unsupported amortization period, the Ordinance operates as a prohibition on coal and petcoke storage and handling at the LRTC facility, and without any consideration of existing or potential mitigation of the purported public health and safety concerns, much less any credible scientific basis for the purported public health and safety concerns asserted in the Ordinance.

145.    The Ordinance operates as a substantial and unjustified impairment of the obligations of those contractual relationships, in violation of the Impairments Clause of the United States Constitution.

146.    Levin's interests will be materially, substantially, and irreparably harmed by the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

29

36087\13079528.1

1  Ordinance.  Accordingly, Levin seeks declaratory and injunctive relief based on the Impairments

2  Clause.

3        Wherefore, Levin prays for judgment as set forth below.

4  **SEVENTH CAUSE OF ACTION**

5  **(Preemption Under the Shipping Act of 1984)**

6       147.    Levin realleges and incorporates by reference the allegations set forth in paragraphs

7  1 through 146, above, as if fully set forth herein.

8       148.    The purpose of the Shipping Act of 1984 is to "establish a nondiscriminatory

9  regulatory process for the common carriage of goods by water in the foreign commerce of the

10  United States with a minimum of government intervention . . . ."  46 U.S.C. § 40101(1).  Further,

11  it was enacted to "promote the growth and development of United States exports through

12  competitive and efficient ocean transportation . . . ."  *Id.* at § 40101(4).

13       149.    The Ordinance conflicts with the Shipping Act and is an obstacle to its purposes

14  and objectives because it inherently increases government intervention in the transport of goods by

15  water in foreign commerce while also restricting exports, which diminishes growth, development

16  and efficient ocean transportation.

17       150.    Further, the Shipping Act of 1984 provides that a marine terminal operator may not

18  (1) agree with another marine terminal operator or with a common carrier to boycott, or

19  unreasonably discriminate in the provision of terminal services to, a common carrier or ocean

20  tramp; (2) give any undue or unreasonable preference or advantage or impose any undue or

21  unreasonable prejudice or disadvantage with respect to any person; or (3) unreasonably refuse to

22  deal or negotiate.  46 U.S.C. § 41106.

23       151.    The Ordinance will force Levin to refuse marine terminal services to shippers of

24  coal and petcoke.  Such discrimination against shippers is expressly prohibited under the Shipping

25  Act of 1984.  The record shows that there is no credible evidence or rational basis to support the

26  City's interference with marine terminal services at the LRTC facility.

27       152.    The Shipping Act of 1984 expressly and impliedly preempts the Ordinance, which

28  affects and unreasonably interferes with marine terminal services that are the subject of federal

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

30

36087\13079528.1

1   jurisdiction, and the Ordinance is therefore invalid and may not be enforced.

2        153.    Levin's interests will be materially, substantially, and irreparably harmed by the

3   Ordinance.  Accordingly, Levin seeks declaratory and injunctive relief based on federal

4   preemption of the Ordinance under the Shipping Act of 1984.

5        Wherefore, Levin prays for judgment as set forth below.

6                            **PRAYER FOR RELIEF**

7        WHEREFORE, Levin respectfully prays that this Court:

8   A.    Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and/or

9         Rule 57 of the Federal Rules of Civil Procedure, that:

10        1.    The Ordinance violates the Commerce Clause of the United States Constitution

11              and is therefore invalid and unenforceable;

12        2.    The Ordinance is preempted by the ICCTA and is therefore invalid and

13              unenforceable;

14        3.    The Ordinance violates the Takings Clause of the United States Constitution

15              and is therefore invalid and unenforceable;

16        4.    The Ordinance violates the Due Process Clauses of the United States

17              Constitution and California Constitution and is therefore invalid and

18              unenforceable;

19        5.    The Ordinance violates the Equal Protection Clauses of the United States

20              Constitution and the California Constitution and is therefore invalid and

21              unenforceable;

22        6.    The Ordinance violates the Impairments Clause of the United States

23              Constitution and is therefore invalid and unenforceable;

24        7.    The Ordinance is preempted by the Shipping Act of 1984 and is therefore

25              invalid and unenforceable.

26   B.    Issue a permanent injunction, pursuant to 28 U.S.C. § 1651, 42 U.S.C. § 1983, and/or

27         Rule 65 of the Federal Rules of Civil Procedure, enjoining the City from implementing

28         or enforcing the Ordinance;

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    31                    36087\13079528.1

1    C.    Award Levin its reasonable attorneys' fees and costs; and

2    D.    Award Levin such other and further relief as the Court may deem just then proper.

3

4    Dated:  March 4, 2020              FARELLA BRAUN + MARTEL LLP

5                                      By:  _____/s/ R. Christopher Locke_____

6                                           R. Christopher Locke

7                                      Attorneys for Plaintiffs Levin Richmond Terminal Corporation,
                                       Richmond Pacific Railroad Corporation, and Levin Enterprises,
8                                      Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

32

36087\13079528.1

# Exhibit A

**#G-10.**

## AGENDA ITEM REQUEST FORM

**Department:** Planning & Building Services          **Department Head:**  Lina Velasco          **Phone:** 510-620-6706

**Meeting Date: 02/04/20**                                        **Final Decision Date Deadline:**

**STATEMENT OF THE ISSUE:**  Over the past year, the City has been receiving increased resident complaints about coal and petroleum coke dust.  In December 2018 and April 2019, the Council directed staff to amend the Richmond Zoning Ordinance to prohibit new land uses and phase out existing land uses related to the storage and handling of coal and petroleum coke; and to modify the zoning ordinance to remove the storage and handling of coal and petroleum coke from the list of uses conditionally allowed in certain industrial zones.  Staff is proposing amendments to the Richmond Municipal Code that would enact the policy direction provided to staff.  an ordinance adding Article 15.04.615 to the Richmond Municipal Code.

### INDICATE APPROPRIATE BODY

☒ City Council          ☐ Redevelopment Agency          ☐ Housing Authority          ☐ Surplus Property Authority          ☐ Joint Powers Financing Authority

☐ Finance Standing Committee          ☐ Public Safety Public Services Standing Committee          ☐ Rules and Procedures Standing Committee          ☐ Local Reuse Authority          ☐ Other _____

### ITEM _____

☐ Presentation/Proclamation/Commendation (3-Minute Time Limit)

☐ Public Hearing                    ☒ Ordinance                    ☐ Other _____

☐ Contract/Agreement               ☐ Council As Whole

☐ Grant Application/Acceptance     ☐ Claims Filed Against City of Richmond

☐ Resolution                       ☐ Video/PowerPoint Presentation (contact KCRT @ 620.6759)

**RECOMMENDED ACTION:** ADOPT an ordinance (second reading): (1) adding Article 15.04.615 to the Richmond Municipal Code ("RMC") to prohibit new land uses and phase out existing land uses related to the storage and handling of coal and petroleum coke, and (2) making conforming amendments to the Richmond Municipal Code ("RMC") to ensure that it is internally consistent - Planning and Building Services Department (Lina Velasco 620-6706). This item was continued from the January 21, 2020, meeting.

**REVIEWS/APPROVALS DO NOT WRITE IN THIS SPACE**

Only items submitted by <u>City Staff</u>  have been reviewed and approved by the **FINANCE DIRECTOR, CITY ATTORNEY, and CITY MANAGER**.

**AGENDA ITEM NO:**

# G-10.

**#G-10.**



# AGENDA REPORT

**PLANNING & BUILDING
SERVICES DEPARTMENT**

**DATE:**      February 04, 2020

**TO:**         Mayor Butt and Members of the City Council

**FROM:**    Lina Velasco, Planning and Building Services Director
James Atencio, Senior Assistant City Attorney

**SUBJECT:**   COAL AND PETROLEUM COKE ORDINANCE (PLN19-191)

**STATEMENT OF THE ISSUE:**
Over the past year, the City has been receiving increased resident complaints about coal and petroleum coke dust.  In December 2018 and April 2019, the Council directed staff to amend the Richmond Zoning Ordinance to prohibit new land uses and phase out existing land uses related to the storage and handling of coal and petroleum coke; and to modify the zoning ordinance to remove the storage and handling of coal and petroleum coke from the list of uses conditionally allowed in certain industrial zones. Staff is proposing amendments to the Richmond Municipal Code that would enact the policy direction provided to staff.

**RECOMMENDED ACTION:**

ADOPT an ordinance (second reading): (1) adding Article 15.04.615 to the Richmond Municipal Code ("RMC") to prohibit new land uses and phase out existing land uses related to the storage and handling of coal and petroleum coke, and (2) making conforming amendments to the Richmond Municipal Code ("RMC") to ensure that it is internally consistent.

**FINANCIAL IMPACT OF RECOMMENDATION:**

There is no direct impact to the General Fund related to adopting this ordinance.

**DISCUSSION:**

**Background**

On December 18, 2018, Councilmember Martinez sponsored an item requesting staff to study a potential draft ordinance that would prohibit the storage and handling of coal and petroleum coke within the City, as well as a proposed amortization period for nonconforming uses that would result from the adoption of such an ordinance.  The Council unanimously approved said direction to staff.  In addition, on April 23, 2019, the Mayor sponsored an item requesting that the Planning Commission review certain proposed amendments to the Zoning Ordinance that would remove the storage and handling of coal and petroleum coke from the list of uses conditionally allowed in certain industrial zones.  This item was unanimously approved by the Council.  Therefore, staff is proposing a modified ordinance for the Planning Commission's consideration that addresses the two policy items adopted by the Council regarding coal and petroleum coke.

A few years ago, coal and petroleum coke exports through the City of Richmond began to dramatically increase. Reports in local media state that exports increased from 176,000 metric tons of coal and 322,000 metric tons of petroleum coke in 2013 to 698,000 tons of coal and 511,000 metric tons of petroleum coke in the first half of 2017.[1] Most, if not all, of these volumes appear to pass through one facility, the Levin-Richmond Terminal.[2] Nearby residents have complained of major increases in coal being stored and blowing off of this facility and local media reports show images of or describe "massive" piles of coal or petroleum coke exposed to the elements at the Levin-Richmond Terminal. *See* Julie Small, *Coal Train Dust Worries Richmond Residents* (June 22, 2015); Andria Borba, *Port of Richmond Sees a Spike in Coal Exports*. The Levin-Richmond Terminal's coal and petroleum coke storage and handling practices were also the subject of a lawsuit brought by San Francisco Baykeeper in 2012 under the Clean Water Act.

The City has received numerous complaints from nearby residents about coal dust from the Levin-Richmond Terminal, which they have found collecting on their homes and nearby streets.  In 2018, Mayor Tom Butt, with assistance by Daniel Butt Law Office, conducted a study based on samples provided voluntarily by residents in the southwest part of Richmond.  These samples were analyzed by the McCrone Associates, Inc., an analytical laboratory in Illinois with expertise in identifying particulate matter, including coal.[3]  Of seven samples tested, five tested positive for coal.

On July 18, 2019, the Planning Commission held a public hearing to consider whether to recommend adoption of the proposed ordinance.  After taking public testimony and comment, the Planning Commission voted to adopt Resolution No. 19-29, recommending that the City Council not adopt the draft ordinance.

---

[1] Janis Hashe, *While Oakland is Worried About Getting Coal, Richmond is Covered in It* (2018).
[2] *See* Julie Small, *Coal Train Dust Worries Richmond Residents* (June 22, 2015).
[3] McCrone Associates Inc. Examination of Samples from Richmond, California for Coal Dust. Re: McCrone Associates Project MA63996(November 9, 2018).

**Current Local Regulations and Recent City Efforts**

At present, the Richmond Municipal Code (RMC) allows some storage and handling of coal and petroleum coke. For example, the RMC defines "Chemical, Mineral, and Explosives Storage" as the "[s]torage and handling of hazardous materials including but not limited to: bottled gas, chemicals, minerals and ores, petroleum or petroleum-based fuels, fireworks, and explosives." RMC § 15.04.104.020. Chemical, Mineral, and Explosives Storage is permitted after review and approval of a conditional use permit in the Industrial, Light (IL); General Industrial (IG); and Water-Related Industrial (IW) districts of the City. RMC § 15.04.204.020.

In 2015, the Richmond City Council adopted Resolution No. 48-15, which adopted a City policy to prohibit using city-owned property for the storage or export of coal or petroleum coke. This resolution also included a non-binding statement that the Council opposes the transportation of coal and petroleum coke through densely populated areas. The City Council also adopted a related resolution requesting that the Bay Area Air Quality Management District ("BAAQMD") regulate the storage and handling of coal and petroleum coke.

**Summary of Proposed Ordinance**

The proposed ordinance establishes a prospective prohibition on the storage and handling of coal and petroleum coke throughout the City of Richmond, with certain exceptions. The ordinance also phases out existing allowed uses of land involving the storage and handling of coal and/or petroleum coke. "Storage or Handling" is defined in the ordinance as "to allow or maintain any pile, including without limitation covered and uncovered piles, piles located above ground, underground, or within containers, or to load, unload, stockpile, or otherwise handle and/or manage, temporarily or permanently, coal and/or petroleum coke." Any land use that fails to comply with the prohibition or phase-out provisions is declared to be an unlawful nuisance subject to the abatement procedures in the RMC.

Enacting these provisions is within the City of Richmond's authority under its police power. The provisions are reasonably related to the legitimate legislative purpose of protecting the public from the hazards of fugitive dust emissions from coal and petroleum coke. Prohibiting and phasing out land uses involving the storage and handling of coal and/or petroleum coke will decrease the opportunities for the public to be exposed to particulate emissions from coal and/or petroleum coke piles.

To comply with legal restrictions on the City's ability to regulate interstate commerce, the ordinance does not regulate the transportation of coal and/or petroleum coke, including through the City of Richmond or to or from a facility where coal or petroleum coke is stored or handled.

The ordinance also contains an express exemption from its prohibitions for certain non-commercial uses in which persons store or handle small amounts of coal or petroleum coke. The exempt non-commercial uses are: residential, educational, scientific, recreational, religious, or cultural uses. These uses are deemed to be small enough that they are not likely to contribute to public health problems.

For non-exempt facilities that lawfully store or handle coal and/or petroleum coke prior to the effective date of the ordinance, otherwise known as nonconforming uses, the ordinance establishes an amortization period of three years during which their storage and handling activities may continue. Such facilities are prohibited, however, from expanding the extent or scope of their coal and/or petroleum storage and handling activities during that time. An amortization period of three years was selected because three years provides a sufficient amount of time for the owners of nonconforming uses to recover investments specific to coal and/or petroleum coke storage and handling and to transition their operations to other commodities.

At the end of the three-year amortization period, nonconforming uses must either discontinue their nonconforming activities or apply for an extension of the amortization period. The availability of extensions is intended to ensure that (1) any owner of nonconforming uses who can demonstrate that three years is an insufficient period of time to recover their investments have an appropriate opportunity to do just that, and (2) the City is striking the proper balance between private property rights and the City's interest in protecting the public from the health hazards of coal and petroleum coke storage and handling.

The Planning Commission would evaluate applications requesting extensions after conducting a duly noticed public hearing and considering all documentary and oral evidence and testimony submitted prior to the end of the hearing.  An amortization analysis is required to be prepared by an expert selected by the City, at the applicant's cost. The Planning Commission is directed to grant an extension of the amortization period if it finds, based on substantial evidence, that an extension is necessary to (a) prevent an unconstitutional taking of property without compensation or (b) to avoid a violation of state or federal law. In reaching its decision on an application for an extension, the Planning Commission shall consider a variety of factors, including, where applicable:

• The applicant's costs of acquiring the property and his or her reasonable investment-backed expectations at the time the property was acquired;
• The present actual or depreciated value of the affected property and improvements with and without the nonconforming land use;
• The total length of time the nonconforming land use has existed and the remaining useful life of the nonconforming land use;
• The applicant's investments in the nonconforming land use and whether and to what extent the applicant will have recouped those investments before the conclusion of the amortization period;

- The salvage value of any improvements that may be used for purposes other than the nonconforming land use;
- The remaining value and allowed uses of the property after discontinuing the nonconforming land use;
- Whether the nonconforming land use interferes with the use and enjoyment of land of nearby property owners or residents, or interferes with or threatens the public health, safety, and welfare of the community;
- The extent to which the nonconforming land use on the property is incompatible with surrounding land uses and properties; and
- Any other factor the Planning Commission reasonably determines is related to determining whether the investment in the nonconforming land use has been recovered.

The Planning Commission's decision regarding an extension of the amortization period may be appealed to the City Council.

Finally, in the event that a property owner—other than an owner of a nonconforming use—contends that the ordinance affects an unconstitutional taking of property without compensation when applied to his or her property, the ordinance establishes a process for requesting exceptions. If the Planning Commission finds, based on substantial evidence, that application of the ordinance would constitute a taking of property, and that the requested exception would allow continued land uses to the minimum extent necessary to avoid such a taking, the Planning Commission shall grant an exception to any provision of the ordinance. The ordinance further directs the Planning Commission that the ordinance shall not apply to the extent that its application violates the constitution or laws of the United States or the State of California.

**Proposed Ordinance's Relation to Known Affected Properties**

The City is currently aware of one property that currently stores and handles coal and petroleum coke and would likely become a nonconforming use if the ordinance is adopted. This property is the Richmond-Levin Terminal. The Richmond-Levin Terminal has long handled numerous bulk commodities other than coal and only recently commenced handling large amounts of coal and petroleum coke. Accordingly, it is neither the purpose nor the anticipated effect of the ordinance to shut this facility down. Rather, staff has proposed the three-year amortization period to ensure that the facility has ample opportunity to replace the quantities of coal and petroleum coke that it has recently begun to handle with other bulk commodities. City staff has reached out to the owners of the Richmond-Levin Terminal in connection with the proposed ordinance, and staff toured the facility.

Based on (1) the nature of the initial investment in the property, (2) the considerable amount of time that the property owners have had to recoup their initial investment, and (3) the suitability of the property to profitably store and handle bulk commodities other than coal and/or petroleum coke, City staff believe that the three-year amortization period provided in the ordinance will be appropriate. Further, the terminal, like any other

**#G-10.**

nonconforming use under the ordinance, will be able to apply for an extension to allow its use to continue for longer than three years if it believes that the amortization period is insufficient to allow it to recoup its coal- and petroleum-coke-specific investments and transition to other commodities.

**Other Amendments for Consistency**

The ordinance will also modify the definition of "Chemical, Mineral, and Explosives Storage" to expressly remove coal and petroleum coke from the definition.

**Public Comments:**

Several letters were received prior to or at the Planning Commission hearing held on July 18, 2019.  Specifically, letters from Levin Richmond Terminal, Farrella, Braun & Martel, Wolverine, and the BAAQMD (See Attachment 2-5) were received.

The law firm Farella, Braun & Martel (Farella letter), representing the Levin-Richmond Terminal submitted a lengthy letter asserting various legal theories against the proposed ordinance. These claims, for the most part, are typical of the types of claims made by property owners who oppose new land use regulations. A few of the claims also involve issues involving federal law governing interstate shipments. These claims are summarized below, along with the reasons why the City Attorney's office believes they lack merit.

First, contrary to the Farella letter's assertion, adopting the ordinance is a lawful exercise of the City's police power to enact zoning and land use laws. Longstanding California law grants the City wide discretion to prohibit unwanted land uses, or to phase them out over time. Such ordinances are lawful unless there is "a complete absence of even a debatable rational basis for the legislative determination" that the ordinance is reasonably related to the public health and welfare. *Birkenfeld v. Berkeley* (1976) 17 Cal.3d 129, 140. Indeed, cities frequently rely on their police power to entirely ban unwanted land uses, including uses related to fossil fuel production. *See Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (2001) 86 Cal.App.4th 534. The City has recently relied on this power to ban new mini-storage uses.

Similarly here, the City has the authority to ban new and phase out existing coal and petroleum coke uses. The Ordinance is reasonably related to protecting public health and welfare because it is well understood that coal and petroleum coke emit particulate pollution that causes respiratory illnesses and other health problems. Phasing out coal and petroleum coke storage and handling from the City would therefore reduce this pollution and the risk of related illnesses. Although the City does *not* need specific evidence linking a particular site to public harm to adopt City-wide public health protections like the Ordinance (*Arnel Dev. Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 514, 522), the City has ample evidence from resident complaints and air quality sampling that the coal and petroleum coke uses banned by the ordinance harm public health and welfare. The Ordinance is a valid exercise of the City's police power.

The Farella letter is also incorrect that the Ordinance would effect an unconstitutional "taking" of its property. A regulation is not a taking unless it strips a property of all economically viable uses of land or drastically decreases the property's value. *See Lucas v. S.C. Coastal Council* (1992) 505 U.S. 1003; *Penn Cent. Transp. Co. v. City of*

**#G-10.**

*New York* (1978) 438 U.S. 104. the Levin-Richmond Terminal could not succeed on such "facial" takings challenge because it cannot show that the adoption of the Ordinance alone would prevent it from making economically viable use of its property. The Ordinance allows Levin (and any other existing facility) to continue storing and handling coal for three years, with the possibility of an extension, and Levin could handle other commodities thereafter. As a result, LRTC would be able to profitably continue the current use its property for *at least* three years.

In addition, unless and until it applied for and was denied an extension under the ordinance, Levin also could not successfully challenge the *application* of the ordinance to its property.  In fact, the Ordinance's three-year phaseout period (with a process to extend the phaseout if legally required) is specifically designed to ensure that Levin obtains a fair economic return even if, as Levin claims, it is not able to profitably transition to handling other commodities at its facility.

Moreover, according to a recent report from the San Francisco Bay Conservation and Development Commission ("BCDC:"), it appears likely that Levin will have the opportunity to seek to handle other commodities. This report explains that other Bay Area ports presently handle commodities like sand and gravel, bauxite and slag, gypsum, and scrap metal. San Francisco Bay Conservation and Development Commission, *2019-1050 Bay Area Seaport Forecast* (June 17, 2019) at p. 8; Planning Commission Agenda Report: Coal and Petroleum Coke Ordinance (PLN19-159) (July 18, 2019), Appendix A at 5.  The same report notes that the Levin-Richmond Terminal itself has handled other commodities in the past. *Id.* Thus, Levin would not able to show that the ordinance severely diminishes the value of its property. In any event, any challenge to a specific *application* of the Ordinance is premature and cannot block the City's adoption of new City-wide regulations.

Levin further claims the ordinance would violate the dormant Commerce Clause of the federal Constitution, which prohibits states and local governments from regulating activities that occur entirely outside their boundaries. But the proposed ordinance regulates land uses entirely within the City of Richmond. It makes no difference if a product is bought, sold, or shipped outside of the regulating jurisdiction, as long as *the actual conduct being regulated*—here, land uses within the City—is entirely within that jurisdiction. *See Chinatown Neighborhood Ass'n v. Harris* (9th Cir. 2015) 794 F.3d 1136, 1145-46.

The dormant Commerce Clause also prohibits ordinances that impose an "excessive burden" on interstate commerce that outweighs the ordinances' benefits. But courts do not consider an ordinance's effect on an individual company, like Levin.  Rather courts look to the burden an ordinance imposes on interstate commerce as a whole. *Exxon Corp. v. Maryland* (1978) 437 U.S. 117, 127-128. Here, the ordinance does not excessively burden interstate commerce just because it may require an insignificant percentage of the global market for coal to shift from one West Coast port to another. Moreover, the ordinance, as a local health and safety regulation, enjoys a "strong presumption of validity." *Pharm. Research & Mfrs. of Am. v. County of Alameda* (9th Cir.

2014) 768 F.3d 1037, 1045. Because the City has evidence of the negative health effects of fugitive dust emissions from coal and petroleum coke, and the benefits of regulating those materials, these benefits clearly outweigh any marginal burden that the ordinance could conceivably place on interstate ecommerce.

The Farella letter also cites a string of federal statutes that it claims preempt the ordinance. But these assertions also lack merit. Levin's main argument, that the ordinance violates the Interstate Commerce Commission Termination Act ("ICCTA"), is incorrect because that law preempts regulations of "*transportation*" by "*rail carriers*." *New York & Atlantic Ry. Co. v. Surface Transp. Bd.* (2d. Cir. 2011) 635 F.3d 66, 72. Levin is not a federally-certified "rail carrier," and the ordinance does not regulate rail "transportation" at all. In fact, the proposed ordinance expressly states that it is not intended to, and shall not be interpreted to, regulate the transportation of coal or petroleum coke. Moreover, a local ordinance does not "regulate" those activities for the purposes of ICCTA preemption unless it is "unreasonably burdensome to rail transportation." *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal. 5th 677, 720. The Ordinance is not unreasonably burdensome on rail transportation: courts have upheld other similar local zoning ordinances enacted to protect public health and safety against similar ICCTA preemption challenges. *See, e.g.*, *Florida East Coast Railway v. City of West Palm Beach* (11th Cir. 2001) 266 F.3d 1324, 1330-31.

The Farella letter's other preemption arguments concerning the Hazardous Materials Transportation Act and the Shipping Act of 1984 are also without merit.  The Hazardous Materials Transportation Act only applies to federally-designated "hazardous" materials, which do not include coal or petroleum coke. The Shipping Act of 1984 bars unreasonable "discrimination" by marine terminal operators; it does not preempt local health and safety regulations like the Ordinance.

Finally, the Farella letter claims the ordinance cannot be adopted without environmental analysis under the California Environmental Quality Act ("CEQA") because a zoning ordinance is a CEQA "project" that may have significant environmental impacts. Three months ago, however, the California Supreme Court unanimously rejected the suggestion that all zoning ordinances are categorically CEQA "projects" that require environmental review. *See Union of Med. Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171. Moreover, here, the Ordinance does not meet CEQA's "project" definition because any indirect effects on the environment are speculative and not reasonably foreseeable. For example, it is entirely speculative whether coal shippers will use more distant terminals or whether Japanese industry will switch to a different fuel. While LRTC has speculated that such environmental impacts could possibly occur, the City lacks any evidence that the asserted impacts are reasonably foreseeable.

Even if the ordinance were a "project," it is categorically exempt from CEQA because phasing out coal and petroleum coke will improve air quality in the City. Thus, the ordinance is exempt as an activity intended to protect natural resources and the environment. CEQA Guidelines §§ 15307, 15308; *see Save the Plastic Bag Coal. v. Cnty. of Marin* (2013) 218 Cal.App.4th 209, 228. For the same reasons, the Ordinance

falls within the "common-sense exemption" because there is no possibility that the Ordinance "may have a significant effect on the environment." CEQA Guidelines § 15061(b)(3). In sum, there is no basis for concluding that the City must perform CEQA review before adopting the Ordinance.

Additional comment letters were received on October 22, 2019 and November 22, 2019 (see Attachments 6-10).

**PLANNING COMMISSION RECOMMENDATION**

On July 18, 2019, the Planning Commission held a public hearing to consider the adoption of the proposed ordinance.

During the public comment period, several speakers raised concerns over the loss on union jobs at the Levin Richmond Terminal should the Ordinance be adopted.  Several speakers also recommended the City wait until AB 617 air monitoring was completed. The Bay Area Air Quality Management District (BAAQMD) provided the following update regarding the status of AB 617 air monitoring.

> We have begun initial AB617 air monitoring in Richmond to identify hot spots of air pollution using car-based monitoring and two sensor network projects. The car-based monitoring is measuring particulate matter concentrations at a block-by-block level, including near rail operations. The information from the car-based monitoring study will be ready for public review by the end of December.  The hot spots identified in the initial monitoring will require further investigation, which will be finalized based on guidance from AB 617 Richmond Steering Committee as part of their broader and ongoing process to prioritize monitoring projects.
>
> The Steering Committee is identifying specific goals for further monitoring and technical analyses. We anticipate that the Steering Committee will identify coal shipment operations as one focus area, but we are still working out the details with them. The Steering Committee is scheduled to complete their prioritization work by the end of 2019. If coal shipment operations are identified by the Steering Committee, the Air District would start the detailed monitoring of coal operations as soon as possible. A year of monitoring is preferred, since air pollution concentrations can vary significantly over the year due to weather conditions.
>
> Richmond officials should be aware that while we expect the monitoring to provide useful data for their decision-making, it may not be conclusive. For example, the initial car-based monitoring may identify higher than normal pollution near rail operations, but it won't be able to differentiate between coal dust, diesel exhaust, or other nearby sources. Even the detailed monitoring may not be conclusive regarding the health impacts of what is

measured, especially if the measured levels are less than current federal and state standards for particulate matter.

It should be noted that BAAQMD has previously emphasized that the AB 617 monitoring efforts are part of a long-term and broader statewide effort to monitor pollution from a variety of sources and that these efforts do not affect the ability of the City to take action now. In fact, in a July 15, 2019 letter, the BAAQMD Deputy Air Pollution Control Officer specifically "applaud[ed] the City's efforts to improve air quality and health in Richmond," without awaiting completion of the AB 617 monitoring. Likewise, BAAQMD Board Member and Chair of the Contra Costa County Board of Supervisors encouraged the City to adopt the proposed ordinance at this time.

After taking public testimony and comment, the Planning Commission voted to adopt Resolution No. 19-29 (see Attachment 11), recommending that the City Council not adopt the draft ordinance because it could not make all of the required findings, specifically finding 15.04.814.050.B. The Planning Commission was unable to find that the proposed ordinance was necessary for public health, safety and welfare, and expressed its position that additional study is needed to better understand the potential air quality impacts of operations at existing sites. The air impact studies should occur in partnership with and be funded by operators, within one year. This would occur prior to the anticipated BAAQMD's AB 617 air monitoring and evaluation. In addition, the Planning Commission desires the preparation of an economic impact analysis to understand the potential economic impacts to the City of Richmond of phasing out any existing coal and/or petroleum coke storage and handling land uses.[4]

As explained above and in materials included with this agenda report, there is ample evidence that coal and petroleum coke uses emit particulates that harm air quality and public health. Phasing out these uses will promote public health and welfare in the City. Staff agrees with BAAQMD that the City "need not delay" the ordinance pending the conclusion of "long-term" AB 617 efforts. The need to reduce emissions in Richmond is well known, and the City has the independent authority to adopt the ordinance under its police power while BAAQMD continues its work under AB 617.

**GENERAL PLAN CONSISTENCY**

The proposed ordinance is consistent with and supports the goals outlined in the Health and Wellness Element of the City's General Plan. For example, the ordinance supports Goal HW9: Improved Environmental Quality. Under this goal, the City will "[c]ontinue to support projects that improve the quality of built and natural environments to support a thriving community and to reduce disparate health and environmental impacts, especially to low-income and disadvantaged communities. Clean air, water and soil, and

---

[4] Separate and apart from this action, the Planning Commission requested that staff investigate possible work without permits that have occurred at LRT overtime. Staff did investigate this issue and issued a Notice of Violation and Demand to Abate on November 4, 2019 for building code and zoning violations. Staff will continue to work with LRT to abate these violations.

a healthy eco-system are critical for human development and contribute to reduced toxic exposure, incidence of disease and environmental degradation." The proposed ordinance supports this goal by reducing particulate matter emissions and toxic exposure, thus promoting clean air and reducing the pollution burdens borne disproportionately by individuals living and working near certain industrial areas.

**ENVIRONMENTAL REVIEW:**

The proposed ordinance is exempt from the California Environmental Quality Act ("CEQA"). First, it is not a Project under CEQA and is therefore exempt pursuant to CEQA Guidelines section 15378. Second, it is exempt from CEQA pursuant to CEQA Guidelines sections 15307 (action to protect natural resources), 15308 (action to protect the environment), and/or 15061(b)(3) ("Common Sense" exemption where there is no reasonable possibility of a significant effect on the environment).

**CONCLUSION:**

Staff is recommending that the City Council adopt the proposed ordinance (1) adding new Article 15.04.615 to the Richmond Municipal Code ("RMC") prohibiting the storage and handling of coal and petroleum coke as a land use, (2) making conforming amendments to the RMC to ensure that it is internally consistent, and (3) establishing a three year amortization period to phase out any existing uses that would become nonconforming uses as a result of this ordinance.

Attachments:
1. Draft Ordinance
   Exhibit A- Draft Coal and Petroleum Coke Regulations
2. LRTC Letter with Exhibits
3. FBM Letter
4. Wolverine Letter
5. BAAQMD Letter
6. SMW LLP Letter
7. Phillips 66 Letter
8. IACC Letter
9. Sierra Club
10. Sierra Club Online Petitions Letter
11. PC Resolution No. 19-29

cc:    Richmond-Levin Terminal
       Richmond Neighborhood Coordinating Council
       Council of Industries
       Sierra Club

**ATTACHMENT 1**

### ORDINANCE No. _____

**A ORDINANCE OF THE CITY COUNCIL OF THE CITY OF RICHMOND AMENDING THE MUNICIPAL CODE OF THE CITY OF RICHMOND BY ADDING NEW ARTICLE 15.04.615 PROHIBITION OF THE STORAGE AND HANDLING OF COAL AND PETROLEUM COKE, AND AMENDING SECTION 15.04.104.010 WAREHOUSING, STORAGE, AND DISTRIBUTION DEFINITION**

WHEREAS, some communities in the City of Richmond are disadvantaged and disproportionately bear the burdens of health-related impacts caused by sources of pollution emitted by various industrial uses and other activities. The California Environmental Protection Agency has identified several census tracts within the City of Richmond as disadvantaged communities disproportionately burdened by and vulnerable to multiple sources of pollution; and

WHEREAS, uncovered coal and petroleum coke piles emit particulate matter (PM10) and fine particulate matter (PM2.5 or smaller) when exposed to wind. Fugitive particulate emissions can also occur when coal or petroleum coke is unloaded from trucks, ships, railroad cars or other containers to storage piles, or when coal or petroleum coke is transferred from storage piles to trucks, ships, railroad cars or other containers. Coal contains toxic heavy metals, including mercury, arsenic, and lead; and petroleum coke contains heavy metals and high levels of sulfur. Exposure to these toxic heavy metals is linked to cancer and birth defects; and

WHEREAS, coal is highly combustible, which poses risks to the health and safety of persons residing, working, or playing nearby, as well as to public safety personnel who would respond to coal fires. Coal fires at storage piles and shipping facilities are difficult to control, requiring fire personnel with specialized equipment and training. Toxic air pollutants released by coal fires would be similar to the toxic pollutants released by coal-fired power plants, but without treatment by emission control systems. Emissions from coal fires include fine particulate matter and metals, including mercury. Persons in close proximity to coal fires could experience both acute and chronic health impacts; and

WHEREAS, exposure to fine particulate pollution has been linked to increased deaths and illnesses due to cardiovascular and respiratory conditions. The World Health Organization and United States Environmental Protection Agency have linked particulate pollution, including from coal and petroleum coke, to significant health problems; and

WHEREAS, storing, loading, unloading, stockpiling, and/or otherwise handling coal and/or petroleum coke, temporarily or permanently, in the City of Richmond, is associated with and/or causes health and safety impacts in humans, including without limitation due to fugitive coal dust, which the American Lung Association considers to be a source of particulate matter that is dangerous to breathe, which the World Health Organization describes (including silica and asbestos) as responsible for most

occupational diseases due to airborne particulates, and which results in dangerous health and safety conditions to the nearby population, as well as to workers and visitors in and near such facilities; and

**WHEREAS**, storing and/or handling coal and/or petroleum coke can negatively impact the environment, including because coal and petroleum coke dust and leachates can pollute waterways, often with long-lasting impacts, and impact and contaminate sensitive habitat within the City; and

**WHEREAS**, a 2017 study by the National Bureau of Economic Research has estimated that, in addition to the social costs of particulate pollution from burning coal, storage and handling creates PM2.5 pollution that generates additional local health costs of about $183 per ton of coal stored; and

**WHEREAS**, City staff has received complaints from members of the community regarding fugitive coal dust from existing facilities that store and handle coal; and

**WHEREAS**, the City Council has already banned coal from City-owned marine terminal facilities, but there are currently no local regulations prohibiting coal or petroleum coke storage and handling at privately-owned facilities; and

**WHEREAS**, the City Council finds that the storage and handling of coal and petroleum coke is not a desired land use; and

**WHEREAS**, existing regulations are inadequate to address the health and environmental problems resulting from coal or petroleum coke storage and handling; and

**WHEREAS**, Article XI, Section 5 of the California Constitution provides that the City, as a home rule charter city, has the power to make and enforce all ordinances and regulations with respect to municipal affairs, and Article XI, Section 7, empowers the City to enact measures that protect and promote the health, safety, and/or welfare of its citizens; and

**WHEREAS**, Article II, Section 1, Paragraph 6 of the Charter of the City of Richmond states that the City shall have and exercise police powers, make all necessary police and sanitary regulations, and adopt ordinances and prescribe penalties for the violation thereof; and

**WHEREAS,** on July 18, 2019, the Planning Commission held a duly and properly noticed public hearing to consider a recommendation to the City Council on the proposed amendments to Chapter 15.04 of the Richmond Municipal Code, incorporated herein by reference; and

**WHEREAS,** the Planning Commission considered the agenda report, all public comments, and the proposed amendments to Chapter 15.04 as set forth in Exhibit A of this Ordinance and the applicable provisions of the Richmond Municipal Code ("the Record") and voted to not recommend adoption of such ordinance; and

**#G-10.**

**WHEREAS,** on December 3, 2019, the City Council held a duly and properly noticed public hearing to consider the proposed amendments to Chapter 15.04 of the Richmond Municipal Code, incorporated herein by reference; and

**WHEREAS,** the City Council considered the agenda report, all public comments, and the proposed amendments and the applicable provisions of the Richmond Municipal Code ("the Record"); and

**WHEREAS, the City Council finds and determines:**

1)      Pursuant to California Environmental Quality Act ("CEQA") Guidelines § 15378 and California Public Resources Code § 21065, new Article 15.04.615 Prohibition of the Storage and Handling of Coal and Petroleum Coke, and amending Section 15.04.104.010 Warehousing, Storage, and Distribution definition are not a "project" because its adoption is not an activity that has the potential for a direct physical change or reasonably foreseeable indirect physical change in the environment; and

2)      Even if the amendments adding new Article 15.04.615 and amended Section 15.04.104.010 Warehousing, Storage, and Distribution definition qualified as a "project" subject to CEQA, and pursuant to CEQA Guidelines § 15061(b)(3), there is no possibility that this project will have a significant impact on the physical environment. The proposed ordinance amends the Richmond Municipal Code to regulate the future establishment of coal and petroleum coke storage and handling facilities and does not directly or indirectly authorize or approve any actual changes in the physical environment; and

3)      The facts set forth in the recitals in this Ordinance are true and correct and incorporated by reference. The recitals constitute findings in this matter and, together with the agenda report, other written reports, public testimony and other information contained in the record, are an adequate and appropriate evidentiary basis for the actions taken in this Ordinance; and

4)      New Article 15.04.615 and amended  Section 15.04.104.010 Warehousing, Storage, and Distribution definition are consistent with the General Plan, Richmond Municipal Code, and applicable State law; and

5)      New Article 15.04.615 and amended Section 15.04.104.010 Warehousing, Storage, and Distribution definition will not be detrimental to the public interest, health, safety, convenience or welfare.

**SECTION I.  Municipal Code Amendments.**

**NOW THEREFORE BE IT RESOLVED,** that the City Council hereby adopts an ordinance adding Article 15.04.615 and amending Section 15.04.104.010 (Amendments to Chapter 15.04) of the Richmond Municipal Code prohibiting the storage and handling of coal and petroleum coke, based on the following findings required per RMC Section 15.04.814.050:

**A.  The proposed amendment is consistent with the General Plan.**

Supporting Statement of Fact:  *Criteria Satisfied.*  The proposed ordinance is consistent with and supports the goals outlined in the Health and Wellness Element of the City's General Plan. For example, the ordinance supports Goal HW9: Improved Environmental Quality. Under this goal, the City shall "[c]ontinue to support projects that improve the quality of built and natural environments to support a thriving community and to reduce disparate health and environmental impacts, especially to low-income and disadvantaged communities. Clean air, water and soil, and a healthy eco-system are critical for human development and contribute to reduced toxic exposure, incidence of disease and environmental degradation." The proposed ordinance supports this goal by reducing particulate matter emissions and toxic exposure, thus promoting clean air and reducing the pollution burdens borne disproportionately by individuals living and working near certain industrial areas.

### B. The proposed amendment is necessary for public health, safety, and general welfare or will be of benefit to the public.

Supporting Statement of Fact:  *Criteria Satisfied.* Particulate matter, including from coal and petroleum coke, has long been linked to significant adverse health effects in adults and children.[1] Particles that are $PM_{10}$ or smaller are of particular concern, because particles of that size may enter the lungs.[2] Numerous governmental and public health organizations—including the World Health Organization and the U.S. Environmental Protection Agency—have concluded that coal- and petroleum-coke-related particulate pollution can cause serious respiratory conditions.[3]  In studying the health effects of particulates linked to coal and petroleum coke, the South Coast Air Quality Management District ("SCAQMD") staff found a relationship between daily levels of $PM_{10}$ and acute respiratory hospital admissions for children. Further, SCAMQD staff found that "each 10 micrograms per cubic meter increase of $PM_{10}$ is correlated with a 2-3% increase in asthma."[4] Particulate pollution from coal and petroleum coke can also have significant cardiovascular health impacts. The American Heart Association issued a statement in 2010 concluding that exposure to PM2.5 or smaller over a few weeks could increase the risks of death from cardiovascular disease. Exposure of longer duration increases the risk more significantly, and can reduce life expectancies by up to several years.[5] Studies have also found that particulate pollution, including pollution related to coal, has led to increased mortality rates and high environmental and health costs. In one study, researchers concluded that a 10% increase in PM2.5 pollution led to a 1.1% increase in average adult mortality rates and a 6.6% increase in average infant mortality rates.[6] That study estimated, based on those figures, that the environmental costs of storing one ton of coal was $183—more than four times the average price a power plant paid for coal at the time of the study.  Coal and petroleum

---

[1] Joel Schwartz, et al., Abstract: *Health effects of outdoor air pollution* (1996).

[2] EPA, *Health Effects of Petroleum Coke*.

[3] Tim Driscoll et al., World Health Organization, *Occupational airborne particulates* (2004); U.S. EPA, *Health and Environmental Effects of Particulate Matter*.

[4] SCAQMD, Staff Report for Proposed Amended Rule 1158 – Storage, Handling and Transport of Coke, Coal and Sulfur (1999).

[5] Robert Brook, et al., *Particulate Matter Air Pollution and Cardiovascular Disease: An Update to the Scientific Statement from the American Heart Association* (2010).

[6] Akshaya Jha & Nicholas Muller.

coke exports through the City of Richmond have dramatically increased in the past few years.  Most, if not all, of this exports pass through the Levin-Richmond Terminal.  The City has received complaints from residents that live near the Levin-Richmond Terminal about coal dust collecting on homes and nearby streets.  The proposed ordinance is necessary for public health and safety as it will reduce particulate matter emissions and toxic exposure from coal and petroleum coke storage, thus promoting clean air and reducing the pollution burdens borne disproportionately by individuals living and working near certain industrial areas.

**C. The proposed amendment has been reviewed in compliance with the requirements of the California Environmental Quality Act.**

Supporting Statement of Fact:  *Criteria Satisfied.* The proposed ordinance is exempt from the California Environmental Quality Act ("CEQA"). First, it is not a Project under CEQA and is therefore exempt pursuant to CEQA Guidelines section 15378. Second, it is exempt from CEQA pursuant to CEQA Guidelines sections 15307 (action to protect natural resources), 15308 (action to protect the environment), and/or 15061(b)(3) ("Common Sense" exemption where there is no reasonable possibility of a significant effect on the environment).

**D. For a change to the Zoning Maps, that the subject property is suitable for the uses permitted in the proposed zone in terms of access, size of parcel, relationship to similar or related uses, and other relevant considerations, and that the proposed change of zoning district is not detrimental to the use of adjacent properties.**

Supporting Statement of Fact:  *Criteria Satisfied.*  The proposed amendments to not involve a zoning map change.  The  Zoning Amendments are only changes to the Zoning Ordinance text.

**SECTION II. The City Council of the City of Richmond does ordain as follows:** Adds Article 15.04.615 and amends Section 15.04.104.010 of the Richmond Municipal Code prohibiting the storage and handling of coal and petroleum coke, attached to this Ordinance as Exhibit A, incorporated herein by reference.

**SECTION III.** _**Severability**_.

If any section, subsection, paragraph, sentence, clause or phrase of this Ordinance is for any reason held by a court of competent jurisdiction to be unconstitutional or invalid, the remaining portions of this Ordinance shall remain in full force and effect.  The City Council hereby declares that it would have passed each section, subsection, paragraph, sentence, clause or phrase of this Ordinance irrespective of the unconstitutionality or invalidity of any section, subsection, paragraph, sentence, clause or phrase.

**SECTION IV. _Effective Date_.**

All applications filed after or pending upon the date of final passage and adoption of this Ordinance shall be subject to this Ordinance. This Ordinance becomes effective thirty (30) days after its final passage and adoption.

**#G-10.**

-----------------------------------------

First introduced at a regular meeting of the City Council of the City of Richmond held December 3, 2019 and finally passed and adopted at a regular meeting held _____ by the following vote:

AYES:

NOES:

ABSTENTIONS:

ABSENT:

_____
  CLERK OF THE CITY OF RICHMOND
(SEAL)

Approved:


_____
Mayor


Approved as to form:


_____
City Attorney


Attachment:  Exhibit A

### Article 15.04.615 PROHIBITION OF THE STORAGE AND HANDLING OF COAL AND PETROLEUM COKE

### 15.04.615.010     Purpose

A.     This Article is intended to protect and promote the health, safety, and welfare of the City's citizens, visitors, and workers by reducing the release of pollutants into the environment as a result of coal and petroleum coke storage and handling. This Article is also intended to reduce the public health, safety, and welfare impacts (including, without limitation, adverse impacts to property values, aesthetics, and economic interests) caused by the storage and handling of coal and petroleum coke.

B.     This Article bans the establishment and/or expansion of storage and handling of coal and/or petroleum coke throughout the City of Richmond, with certain exceptions. The Article also phases out existing allowed uses of land involving the storage and handling of coal and petroleum coke, by providing a three-year amortization period for such existing allowed uses to transition to other lawful uses and materials. This amortization period is intended to strike a proper balance between protecting the public from the health hazards of coal and petroleum coke storage and handling, while also protecting existing jobs and providing sufficient time for businesses to transition.

C.     This Article is not intended to, and shall not be interpreted to regulate or applied to prohibit the transportation of coal and/or petroleum coke, for example, by train or marine vessel, including without limitation through the City of Richmond or to or from a coal or petroleum coke storage and handling facility.

### 15.04.615.020     Definitions

As used in this Article, the following terms have the following meanings:

A.     "Coal" means a solid, brittle, carbonaceous rock classified as anthracite, bituminous, subbituminous, or lignite by the American Society for Testing and Materials ("ASTM") Designation D388-77.

B.     "Petroleum Coke" means a solid carbonaceous residue produced from a coker after cracking and distillation from petroleum refining operations, including such residues produced by petroleum upgraders in addition to petroleum refining.

C.     "Coal or Petroleum Coke Storage and Handling Facility" means an existing or proposed site or facility, including all contiguous land, structures, other appurtenances, and improvements thereon, or any part thereof, where coal or petroleum coke is or may be stored or handled.

D.     "Effective Date" means the date that Ordinance No. ____-__, adding Article 15.04.615 to the Richmond Municipal Code, took effect.

E.    "Owner or Operator" means any person who has legal title to any coal or petroleum coke storage and handling facility; who has charge, care, or control of any coal or petroleum coke storage and handling facility; who is in possession of any coal or petroleum coke storage and handling facility or any part thereof; and/or who is entitled to control or direct the management of any coal or petroleum coke storage and handling facility.

F.    "Store or Handle, or Storing or Handling, or Storage or Handling," means to allow or maintain any pile, including without limitation covered and uncovered piles, piles located above ground, underground, or within containers, or to load, unload, stockpile, or otherwise handle and/or manage, temporarily or permanently, coal and/or petroleum coke.

**15.04.615.030    Prohibition on storage and/or handling of coal or petroleum coke**

The storage and handling of coal and petroleum coke at a coal or petroleum coke storage and handling facility is prohibited in all zoning districts.

**15.04.615.040    Exemptions**

The following non-commercial uses are exempt from the provisions of this Article 15.04.615:  residential, educational, scientific, recreational, religious, or cultural uses in which persons store or handle small amounts of coal or petroleum coke.

**15.04.615.050    Amortization Period for Nonconforming Uses**

A.    Notwithstanding any provision in this Code to the contrary, this Section shall apply to all lawful existing land uses that do not conform with the requirements of Section 15.04.615.030 of this Code as of the effective date.

B.    As used in this Section, "nonconforming land use" means any coal or petroleum coke storage and handling facility in existence prior to the effective date.

C.    Except as otherwise provided in this Section, all nonconforming land uses shall be discontinued within three years after the effective date. The three-year period after the effective date shall be referred to as the "amortization period."

D.    Nonconforming land uses shall not increase the amount of coal or petroleum coke stored or handled in a calendar year beyond the average amount of coal or petroleum coke stored or handled annually at the coal or petroleum coke storage and handling facility in the three years prior to the effective date. Nonconforming land uses shall not expand the footprint of coal or petroleum coke storage or handling activities at the coal or petroleum coke storage and handling facility.

E.    Within two months of the effective date, the Zoning Administrator shall use reasonable efforts to identify and provide notice to all owners or operators of any

coal or petroleum coke storage and handling facility informing them that they must do either of the following: (a) discontinue any nonconforming land use before the conclusion of the amortization period; or (b) apply for an extension of the amortization period pursuant to sub-section F of this Section. Failure to receive notice from the Zoning Administrator shall not excuse an owner or operator from compliance with the provisions of this Section.

F.    Any affected owner or operator of a nonconforming land use may apply to the Planning Commission for an extension of the amortization period on a form provided by the Director pursuant to Section 15.04.803.020. The affected owner or operator shall pay any applicable fees established pursuant to that Section. Applications for an extension of the amortization period shall be submitted no later than 12 months prior to the end of the amortization period.  The Planning Commission shall conduct a duly noticed public hearing to consider the application for extension of the amortization period within a reasonable time after the application has been deemed complete by the Zoning Administrator.

1.    "Limited Notice (Type B)" shall be provided pursuant to Section 15.04.803.070 of this Code not less than 24 calendar days prior to the date of the hearing.

2.    In deciding whether to extend the amortization period, the Planning Commission shall consider all documentary and oral evidence and testimony submitted prior to the conclusion of the hearing. As part of the application, an amortization analysis shall be prepared, at the applicant's expense, by an expert retained by the City, prior to Planning Commission consideration.

3.    The Planning Commission shall grant an extension of the amortization period if it finds, based on substantial evidence, that such extension is necessary to prevent an unconstitutional taking of property without compensation or to avoid a violation of state or federal law. Any extension so granted shall be the minimum necessary to prevent such impairment or violation. In no event shall the Planning Commission grant any extension if it finds that continuing the nonconforming land use would constitute a public nuisance under Civil Code sections 3479 and 3480.

4.    The Planning Commission's decision shall be based upon the following factors, where applicable:
   a.    The cost to the applicant of acquiring the affected property and the applicant's reasonable investment-backed expectations at the time the property was acquired;
   b.    The present actual or depreciated value of the affected property and improvements with and without the nonconforming land use;
   c.    The total length of time the nonconforming land use has existed and the remaining useful life of the nonconforming land use;

      d.     The applicant's investments in the nonconforming land use and whether and to what extent the applicant will have recouped those investments before the conclusion of the amortization period;

      e.     The salvage value of any improvements that may be used for purposes other than the nonconforming land use;

      f.     The remaining value and allowed uses of the property after discontinuing the nonconforming land use;

      g.     Whether the nonconforming land use interferes with the use and enjoyment of land of nearby property owners or residents, or interferes with or threatens the public health, safety, and welfare of the community;

      h.     The extent to which the nonconforming land use on the property is incompatible with surrounding uses and properties; and

      i.     Any other factor the Planning Commission reasonably determines is related to determining whether the investment in the nonconforming land use has been recovered.

    5.     The owner or operator requesting the extension shall have the burden of demonstrating that it is entitled to an extension under sub-section F above.  The Planning Commission's determination under this sub-section may be appealed to the City Council in the same manner as prescribed in Section 15.04.803.140 of this Code.

K.     Nothing in this Section is intended to affect or restrict the City's authority to immediately terminate, discontinue, or abate any land uses found to be a nuisance, or that are otherwise operating unlawfully, including a nonconforming land use. This Article does not create or confer any vested rights.

### 15.04.615.060      Violations; Declaration of a Nuisance; Abatement

Any land use that fails to comply with or violates any provision of this Article is hereby declared to be an unlawful nuisance. Any land use declared to be a nuisance pursuant to this Section may be subject to the abatement procedures established in Section 15.04.815.040 and Chapter 9.22 of this Code.

### 15.04.615.070      Exceptions; Procedures

A.     The provisions of this Article shall not be applicable to the extent, but only to the extent, that they would violate the constitution or laws of the United States or of the State of California.

B.     In the event a property owner contends that the application of this Article effects an unconstitutional taking of property without compensation, the property owner may request, and the Planning Commission shall grant, an exception to application of any provision of the Article if the Planning Commission finds, based on substantial evidence, that both (1) the application of any aspect of the Article would constitute an unconstitutional taking of property, and (2) the exception will

allow continued land uses only to the minimum extent necessary to avoid such a taking; provided, however, that in the case of nonconforming uses, the procedures set forth in Section 15.04.615.050.F shall govern.  The property owner shall have the burden of demonstrating that it is entitled to an exception under this sub-section.  The Planning Commission's determination under this sub-section may be appealed to the City Council in the same manner as prescribed in Section 15.04.803.140 of this Code.

### 15.04.615.080       Non-applicability to Transportation of Coal and/or Petroleum Coke

Notwithstanding anything to the contrary contained in this Article, this Article is not intended to and shall not be interpreted to regulate the transportation of coal and/or petroleum coke, for example, by train or marine vessel, including without limitation through the City of Richmond or to or from a coal or petroleum coke storage and handling facility.

### 15.04.615.090       Conflicting Provisions

Where a conflict exists between the requirements in this Article and applicable requirements contained in other provisions of this Code, the applicable requirements of this Article shall prevail.

### Conforming Amendments to Richmond Municipal Code

Section 15.04.104.010 of the Richmond Municipal Code is hereby amended, in pertinent part, as follows (added text shown in underline):

***Chemical, Mineral, and Explosives Storage.*** Storage and handling of hazardous materials including but not limited to: bottled gas, chemicals, minerals and ores, petroleum or petroleum-based fuels, fireworks, and explosives. Notwithstanding the foregoing sentence, the storage and handling of coal and petroleum coke is prohibited in accordance with Article 15.04.615 to the Richmond Municipal Code, except as expressly provided therein.

# Exhibit B

## RESOLUTION NO. 19-29

**A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF RICHMOND RECOMMENDING THAT THE CITY COUNCIL OF THE CITY OF RICHMOND DOES NOT ADOPT ARTICLE 15.04.615 PROHIBITION OF THE STORAGE AND HANDLING OF COAL AND PETROLEUM COKE, AND DOES NOT APPROVE AMENDING SECTION 15.04.104.010 WAREHOUSING, STORAGE, AND DISTRIBUTION DEFINITION OF THE RICHMOND MUNICIPAL CODE**

**WHEREAS,** some communities in the City of Richmond are disadvantaged and disproportionately bear the burdens of health-related impacts caused by sources of pollution emitted by various industrial uses and other activities. The California Environmental Protection Agency has identified several census tracts within the City of Richmond as disadvantaged communities disproportionately burdened by and vulnerable to multiple sources of pollution; and

**WHEREAS**, uncovered coal and petroleum coke piles emit particulate matter (PM10) and fine particulate matter (PM2.5 or smaller) when exposed to wind. Fugitive particulate emissions can also occur when coal or petroleum coke is unloaded from trucks, ships, railroad cars or other containers to storage piles, or when coal or petroleum coke is transferred from storage piles to trucks, ships, railroad cars or other containers. Coal contains toxic heavy metals, including mercury, arsenic, and lead; and petroleum coke contains heavy metals and high levels of sulfur. Exposure to these toxic heavy metals is linked to cancer and birth defects; and

**WHEREAS**, coal is highly combustible, which poses risks to the health and safety of persons residing, working, or playing nearby, as well as to public safety personnel who would respond to coal fires. Coal fires at storage piles and shipping facilities are difficult to control, requiring fire personnel with specialized equipment and training. Toxic air pollutants released by coal fires would be similar to the toxic pollutants released by coal-fired power plants, but without treatment by emission control systems. Emissions from coal fires include fine particulate matter and metals, including mercury. Persons in close proximity to coal fires could experience both acute and chronic health impacts; and

**WHEREAS**, exposure to fine particulate pollution has been linked to increased deaths and illnesses due to cardiovascular and respiratory conditions. The World Health Organization and United States Environmental Protection Agency have linked particulate pollution, including from coal and petroleum coke, to significant health problems; and

**WHEREAS**, storing, loading, unloading, stockpiling, and/or otherwise handling coal and/or petroleum coke, temporarily or permanently, in the City of Richmond, is associated with health and safety impacts in humans, including without limitation due to fugitive coal dust, which the American Lung Association considers to be a source of particulate matter that is dangerous to breathe, which the World Health Organization describes (including silica and asbestos) as responsible for most occupational diseases due to airborne particulates, and which results in dangerous health and safety

conditions to the nearby population, as well as to workers and visitors in and near such facilities; and

**WHEREAS**, storing and/or handling coal and/or petroleum coke can negatively impact the environment, including because coal and petroleum coke dust and leachates can pollute waterways, often with long-lasting impacts, and impact and contaminate sensitive habitat within the City; and

**WHEREAS**, a 2017 study by the National Bureau of Economic Research has estimated that, in addition to the social costs of particulate pollution from burning coal, storage and handling creates PM2.5 pollution that generates additional local health costs of about $183 per ton of coal stored; and

**WHEREAS**, city staff has received complaints from members of the community regarding fugitive coal dust from existing facilities that store and handle coal; and

**WHEREAS**, the Richmond City Council has already banned coal from City-owned marine terminal facilities, but there are currently no local regulations prohibiting coal or petroleum coke storage and handling at privately-owned facilities; and

**WHEREAS**, notwithstanding the foregoing the Richmond Planning Commission does not find that the storage and handling of coal and petroleum coke is an undesirable land use; and

**WHEREAS**, Article XI, Section 5 of the California Constitution provides that the City, as a home rule charter city, has the power to make and enforce all ordinances and regulations with respect to municipal affairs, and Article XI, Section 7, empowers the City to enact measures that protect and promote the health, safety, and/or welfare of its citizens; and

**WHEREAS**, Article II, Section 1, Paragraph 6 of the Charter of the City of Richmond states that the City shall have and exercise police powers, make all necessary police and sanitary regulations, and adopt ordinances and prescribe penalties for the violation thereof; and

**WHEREAS,** on July 18, 2019, the Planning Commission held a duly and properly noticed public hearing to consider a recommendation to the City Council on the proposed amendments to Chapter 15.04 of the Richmond Municipal Code, incorporated herein by reference; and

**WHEREAS,** the Planning Commission has considered the agenda report, all public comments, and the proposed amendments to Chapter 15.04 as set forth in Exhibit A of this Resolution and the applicable provisions of the Richmond Municipal Code ("the Record").

**NOW THEREFORE BE IT RESOLVED,** that the Planning Commission hereby recommends that the City Council not adopt an ordinance adding Article 15.04.615 which would also amend Section 15.04.104.010 (Amendments to Chapter 15.04) of the Richmond Municipal Code prohibiting the storage and handling of coal and petroleum

coke, based on the Planning Commission being unable to make certain findings as required per RMC Section 15.04.814.050:

**A. The proposed amendment is consistent with the General Plan.**

<u>Supporting Statement of Fact:</u> *Criteria Satisfied.* The proposed ordinance is consistent with and supports the goals outlined in the Health and Wellness Element of the City's General Plan. For example, the ordinance supports Goal HW9: Improved Environmental Quality. Under this goal, the City shall "[c]ontinue to support projects that improve the quality of built and natural environments to support a thriving community and to reduce disparate health and environmental impacts, especially to low-income and disadvantaged communities. Clean air, water and soil, and a healthy eco-system are critical for human development and contribute to reduced toxic exposure, incidence of disease and environmental degradation." The proposed ordinance supports this goal by reducing particulate matter emissions, thus promoting cleaner air and potentially reducing the pollution burdens borne disproportionately by individuals living and working near certain industrial areas.

**B. The proposed amendment is necessary for public health, safety, and general welfare or will be of benefit to the public.**

<u>Supporting Statement of Fact:</u> *Criteria Not Satisfied.* The Planning Commission cannot find that the proposed ordinance is necessary for public health, safety and welfare, and expressed its position that additional study is needed to better understand the potential air quality impacts of operations at existing sites. The air impact studies should occur in partnership with and funded by operators, within one year. This would occur prior to the anticipated BAAQMD's AB 617 air monitoring and evaluation. In addition, the Planning Commission desires the preparation of an economic impact analysis to understand the potential economic impacts to the City of Richmond of phasing out any existing coal and/or petroleum coke storage and handling land uses.

**C. The proposed amendment has been reviewed in compliance with the requirements of the California Environmental Quality Act.**

<u>Supporting Statement of Fact:</u> *Criteria Satisfied.* The proposed ordinance is exempt from the California Environmental Quality Act ("CEQA"). First, it is not a Project under CEQA and is therefore exempt pursuant to CEQA Guidelines section 15378. Second, it is exempt from CEQA pursuant to CEQA Guidelines sections 15307 (action to protect natural resources), 15308 (action to protect the environment), and/or 15061(b)(3) ("Common Sense" exemption where there is no reasonable possibility of a significant effect on the environment).

**D. For a change to the Zoning Maps, that the subject property is suitable for the uses permitted in the proposed zone in terms of access, size of parcel, relationship to similar or related uses, and other relevant considerations, and that the proposed change of zoning district is not detrimental to the use of adjacent properties.**

**#I-1.**

<u>Supporting Statement of Fact:</u>  *Criteria Satisfied.*  The proposed amendments do not involve a zoning map change.  The Zoning Amendments are only changes to the Zoning Ordinance text.

**NOW THEREFORE BE IT RESOLVED**, that the Planning Commission hereby recommends to the City Council that it not adopt the proposed ordinance adding Article 15.04.615 and not amend Section 15.04.104.010 of the Richmond Municipal Code, attached to this Resolution as Exhibit A, which would prohibit the storage and handling of coal and petroleum coke.

--------------------

I HEREBY CERTIFY that the foregoing Resolution was adopted by the Planning Commission of the City of Richmond at a regular meeting held on July 18, 2019.

Ayes:      Vice-Chair Butt, Commissioners Baer, Loy, Huang, Garcia, Tucker and Evans

Noes:      None

Absent:    None

Abstain:   None

Andrew Butt
Planning Commission Vice-Chair

Approved as to Form:

James Atencio
Assistant City Attorney

Attachment:  Exhibit A:  Draft Article 15.04.615 and amended Section 15.04.104.010

Resolution No. 19-29