United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

**LEVIN RICHMOND TERMINAL CORPORATION, ET AL.,**

    Plaintiffs,

    vs.

**CITY OF RICHMOND, ET AL.,**

    Defendants,

---

**WOLVERINE FUELS SALES, LLC,**

    Plaintiff,

vs.

**CITY OF RICHMOND, ET AL.,**

    Defendants,

---

**PHILLIPS 66 COMPANY,**

    Plaintiff,

vs.

**CITY OF RICHMOND, ET AL.,**

    Defendants.

CASE NOS. 20-cv-01609-YGR
           20-cv-01614-YGR
           20-cv-01643-YGR

**ORDER (1) GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS; (2) GRANTING MOTIONS TO INTERVENE AND AMICI MOTIONS**

Plaintiffs Levin Richmond Terminal Corporation, Richmond Pacific Railroad Corporation, and Levin Enterprises, Inc. (collectively, "Levin"); Wolverine Fuels Sales, LLC ("Wolverine"); and Phillips 66 Company ("Phillips 66") bring these related actions seeking to invalidate and enjoin an ordinance adopted by defendants City of Richmond and City Council of the City of Richmond, entitled "Prohibition on the Storage and Handling of Coal and Petroleum Coke" (the "Ordinance"). Now before the Court are defendants' motions to dismiss, as well as motions to

1   intervene and separate motions to dismiss brought by proposed intervenors Sierra Club and San

2   Francisco Baykeeper.  The motions came on for hearing on August 18, 2020.  Having carefully

3   considered the papers submitted, the arguments of the parties at the hearing, the admissible

4   evidence, and the pleadings in this action, and for the reasons set forth below, the Court hereby

5   (1) **DENIES** the motions to dismiss, except with respect to the Hazardous Materials Transportation

6   Act claim, which is **DISMISSED WITH PREJUDICE**; and (2) **GRANTS** the motions to intervene,

7   subject to the conditions set forth herein.[1]

8   **I.      FACTUAL BACKGROUND**

9           The complaints allege as follows:[2]

10          Richmond, California is a city located along the San Francisco Bay.  Since 1981, Levin has

11  operated the Levin-Richmond Terminal, a port and marine terminal located in Richmond, where a

12  range of commodities are received, stored, handled, and transferred for shipment overseas.  For the

13  past six years, petroleum coke ("petcoke") and coal have accounted for more than 80 percent of

14  the terminal's transloading business.  The terminal currently is the only coal and petcoke bulk

15  handling facility and transfer point for marine shipment in the Bay Area.

16

17

18          [1] The State of California, the State of Utah, and Operating Engineers Union Local No. 3
    each have filed motions for leave to file amici curiae briefs.  District courts have broad discretion
19  to appoint amici curiae.  *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), abrogated on other
    grounds by *Sandin v. Conner*, 515 U.S. 472 (1995).  Here, the Court finds it appropriate to
20  consider the views of the amici curaie because they, and their respective constituents, have an
    interest in the issues presented. *See Funbus Sys., Inc. v. State of Cal. Pub. Utilities Comm'n.*, 801
21  F.2d 1120, 1125 (9th Cir. 1986) (describing the "classic role" of amici as "assisting in a case of
    general public interest"); *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d
22  1061, 1067 (N.D. Cal. 2005) ("District courts frequently welcome amicus briefs from non-parties
    concerning legal issues that have potential ramifications beyond the parties directly involved[.]").
23  Accordingly, the Court in its discretion **GRANTS** the proposed amici curiae's motions for leave to
    file and has considered the positions asserted in their briefs.
24
            [2] Under Rule 201 of the Federal Rules of Evidence, the Court may take notice of any
25  "adjudicative fact" that is "not subject to reasonable dispute" because it "can be accurately and
    readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.
26  201.  Here, defendants and each of the plaintiffs request judicial notice of several documents.
    Having reviewed the briefing, the Court hereby takes judicial notice of the Ordinance, which is a
27  matter of public record not subject to reasonable dispute.  *See Colony Cove Props., LLC v. City of
    Carson*, 640 F.3d 948, 954 n.3 (9th Cir. 2011).  The remaining requests are denied because they
28  improperly are offered for the truth of the matters asserted therein and/or are moot.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Phillips 66 operates a nearby oil refinery, where it produces petcoke.  Phillips 66 transports its petcoke to Levin-Richmond Terminal by way of covered trucks.  At the terminal, petcoke is transferred from the trucks to ocean-going freighters for shipment to customers in Australia, Asia, Europe, and other locations.  Similarly, Wolverine mines and sources thermal coal, which it transports from its Utah headquarters to the Levin-Richmond Terminal, via the Union Pacific Railroad, for transshipment by merchant vessel to customers in Japan.  Some temporary indoor storage and handling is incidental to product transfer from trucks and rails to marine vessels.

In 2015, the Richmond City Council adopted a resolution banning the storage and export of coal and petcoke on city-owned property.  The resolution included a non-binding statement that the Richmond City Council opposed the transportation of coal and petcoke along California waterways, through densely populated areas, and through the city on existing rail lines and roadways.  Five years later, after receiving complaints from residents and conducting numerous public hearings, and notwithstanding the Richmond Planning Commission voting unanimously against it, the City adopted the Ordinance, which extended the prohibition on coal and petcoke storage and handling to all property in Richmond.  The "whereas" clauses in the Ordinance noted, among other things, that the dust from coal and petcoke storage and handling was associated with negative health and safety impacts on disadvantaged communities in Richmond that were disproportionately burdened by and vulnerable to multiple sources of pollution.  Thus, the stated purpose of the Ordinance was to "protect and promote the health, safety and welfare of the City's citizens, visitors, and workers by reducing the release of pollutants into the environment" and "reduce the public health, safety, or welfare impacts" caused by the storage of handling of coal and petcoke.  The Ordinance also provided a three-year amortization period "intended to strike a proper balance between protecting the public from the health hazards of coal and petroleum coke storage and handling, while also protecting existing jobs and providing sufficient time for businesses to transition."  The Ordinance required the City to extend the amortization period if an applicant demonstrated that three years was insufficient to prevent a taking of its property.

Plaintiffs claim that the Ordinance violates their constitutional rights and is preempted by federal law.  Specifically, Phillips 66's complaint alleges that the Ordinance (i) places an undue

3

United States District Court
Northern District of California

burden on interstate and foreign commerce in violation of the Commerce Clause (U.S. Const. art. I, § 8, cl. 3); and (ii) infringes on its contracts with Levin and others in violation of the Contracts Clause (U.S. Const. art. 1, § 10, cl. 1).  Wolverine's complaint alleges Commerce Clause and Contracts Clause claims, as well as (i) preemption under the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, *et seq.*; (ii) preemption under the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. § 5101, *et seq.*; (iii) preemption under the Shipping Act of 1984 (the "Shipping Act"), 46 U.S.C. § 40101, *et seq.*; and (iv) violation of the Due Process Clause (U.S. Const. amend. XIV, § 1).  Levin's complaint alleges claims under the Commerce Clause, Contracts Clause, ICCTA, Shipping Act, and Due Process Clause,[3] as well as (i) violation of the Takings Clause (U.S. Const. Amend. V; Cal. Const. art. I, § 19); and (ii) violation of the Equal Protection Clause (U.S. Const. amend. XIV, § 1; Cal. Const. art. I, § 7, subd. (a)).

## II.   MOTIONS TO DISMISS

Defendants seek dismissal of all causes of action brought by all plaintiffs in this action.  A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff.  *Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000, 1010 (9th Cir. 2011).  However, the Court "need not accept conclusory allegations of law or unwarranted inferences."  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 (9th Cir. 2007).

---

[3] While Wolverine brings its due process claim under the U.S. Constitution only, Levin brings its parallel claim under the U.S. Constitution and the California Constitution.  *See* Cal. Const. art. I, § 7, subd. (a).

1     The Court addresses each cause of action in turn.

2     **A.     Commerce Clause (All Plaintiffs)**

3     Plaintiffs' complaints allege that the Ordinance places a significant burden on interstate

4 and foreign commerce by effectively prohibiting marine shipments of coal and petcoke through

5 the Levin-Richmond Terminal, which is critical for transshipment to national and overseas

6 markets.  Plaintiffs claim violations of the dormant Commerce Clause and the foreign Commerce

7 Clause.

8                    *1.     Dormant Commerce Clause*

9     The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate

10 Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.   The

11 so-called dormant Commerce Clause—the implied, negative aspect of the Commerce Clause—

12 prohibits states and local governments from enacting laws "unjustifiably to discriminate against or

13 burden the interstate flow of articles of commerce."  *Or. Waste Sys., Inc. v. Dep't of Envtl.*

14 *Quality*, 511 U.S. 93, 98 (1994) (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992)).  "The

15 'central rationale' of the dormant Commerce Clause 'is to prohibit state or municipal laws whose

16 object is local economic protectionism.'"  *S.D. Myers, Inc. v. City & Cty. of San Francisco*, 253

17 F.3d 461, 466 (9th Cir. 2001) (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383,

18 390 (1994)).  In considering a dormant Commerce Clause claim, the court first must determine

19 whether the challenged action "directly regulates or discriminates against interstate commerce, or

20 its effect is to favor in-state economic interests over out-of-state interests."  *Chinatown*

21 *Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1145 (9th Cir. 2015) (alteration and citation

22 omitted).  If the challenged action is nondiscriminatory—that is, it regulates in-state and out-of-

23 state economic interests evenhandedly—it still violates the Commerce Clause if "the burdens of

24 the statute so outweigh the putative benefits as to make the statute unreasonable or irrational."  *Id.*

25 (citation omitted).

26     Plaintiffs assert two theories for recovery thereunder.  First, Levin and Wolverine allege a

27 per se violation under the extraterritoriality doctrine, namely that the Ordinance discriminates

28 against interstate and foreign commerce by regulating transactions beyond the City's borders. All

United States District Court
Northern District of California

United States District Court
Northern District of California

plaintiffs additionally allege that the Ordinance fails under the *Pike* balancing test because it imposes an undue burden on interstate commerce that outweighs any putative benefits. *See Pike v. Burch Church, Inc.*, 397 U.S. 137, 142 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.").

As to the extraterritoriality doctrine, a regulatory action that "directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority." *Healy v. Beer Inst.,* 491 U.S. 324, 336 (1989). Under *Healy,* the "critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundary of the State." *Id.* (citing *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579 (1986)). To determine the practical effect of the regulation, courts consider not only the direct consequences of the statute itself, but also "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.*

The Ninth Circuit has noted that "[i]n the modern era, the Supreme Court has rarely held that statutes violate the extraterritoriality doctrine." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1101 (9th Cir. 2013). The two most prominent cases in which the court has found a violation, *Brown-Forman* and *Healy*, involved price-affirmation statutes that required merchants to affirm that that the prices they charged in-state were as low as those charged in neighboring states. *Id*. at 1101-02. The Ninth Circuit found these price-affirmation cases to be distinguishable from the facts presented in *Rocky Mountain*. *Id*. at 1102. Specifically, the court found that while California's low carbon fuel standard regulated the use of fuel in California, it said "nothing at all about ethanol produced, sold, and used outside California," nor did it "require other jurisdictions to adopt reciprocal standards before their ethanol can be sold in California." *Id*. at 1102-03. More recently, in *Chinatown Neighborhood Ass'n*, 794 F.3d at 1145-46, the Ninth Circuit rejected an extraterritoriality challenge to a state law banning the sale and trade of shark fins, holding that "even when state law has significant extraterritorial effects, it passes Commerce Clause muster

when . . . those effects result from the regulation of in-state conduct."

The Court finds this case is far more analogous to *Rocky Mountain* and *Chinatown Neighborhood Ass'n* than the price-affirming cases. The Ordinance regulates the storage and handling of coal and petcoke within Richmond; it is silent regarding the use, sale, and transport of these products elsewhere. Further, while plaintiffs allege that state and local governments and environmental groups are lodging a campaign to block shipment of these commodities from other West Coast marine terminals, plaintiffs do not state facts indicating "conflicting, legitimate legislation is already in place or [] the threat of such legislation is both actual and imminent." *S.D. Myers*, 253 F.3d at 469-70. *Healy* does not require the Court to engage in blind speculation regarding the interaction between the Ordinance and potential legislation affecting marine ports up and down the coast. *Id*. at 470 ("The [Supreme] Court has never invalidated a state or local law under the dormant Commerce Clause based upon mere speculation about the possibility of conflicting legislation"); *see also Silver v. Woolf*, 694 F.2d 8, 13-14 (2d Cir. 1982) ("cumulative burden" of states' regulations was "totally speculative"). As such, plaintiffs fail to state a legally cognizable theory under the extraterritoriality doctrine.

Having found the extraterritoriality theory of recovery fails, the Court considers plaintiffs' claims under the *Pike* balancing test, which focuses on the issue of undue burden. Plaintiffs' allegations are best understood as asserting two intertwined, overlapping bases for finding undue burden: first, the Ordinance unduly burdens a uniform national system of transportation, and second, the Ordinance places an undue burden on the interstate market for coal and petcoke.

As to the first undue burden theory, plaintiffs allege that the Ordinance impairs the inherently national interest in a uniform and efficient system of transportation of important commodities like coal and petcoke in interstate commerce. As plaintiffs correctly note, courts have found that a law which regulates activities that are "inherently national or require a uniform system of regulation—most typically, interstate transportation"—imposes significant burdens on interstate commerce. *Chinatown Neighborhood Ass'n*, 794 F.3d at 1146-47 (internal citation omitted). The cases on which plaintiffs rely, however, involved laws that directly regulated modes of transportation. *See Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 445-48 (1978)

United States District Court
Northern District of California

(invalidating statute governing truck length); *Bibb v. Navajo Freight Lines*, 359 U.S. 520, 529-30 (1959) (invalidating law requiring contour mudguards on trucks and trailers).  No such regulation of transportation is at issue here.  Nor have plaintiffs otherwise pleaded facts showing an inherently national or uniform system of storing and handling petcoke.  Thus, plaintiffs have not sufficiently alleged an undue burden on an inherently uniform national system of transportation. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127-28 (1978) (rejecting claim that state regulation addressing retail marketing of gas interfered with national market for petroleum products); *Chinatown Neighborhood Ass'n*, 794 F.3d at 1146 (state law prohibiting the sale or possession of shark fins, whose purpose was to "conserve state resources, prevent animal cruelty, and protect wildlife and public health," did not interfere with any inherently national activity, and instead, addressed "legitimate matters of local concern"); *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 950 (9th Cir. 2013) (in action challenging state ban on sale of products that were the result of force-feeding birds, finding at motion to dismiss stage that plaintiffs "ha[d] not demonstrated that a nationally uniform foie gras production method is required to produce foie gras.").

Plaintiffs' second undue burden theory is that the Ordinance so burdens the interstate markets for coal and petcoke that it outweighs any putative benefits.  To withstand dismissal on this theory, plaintiffs must allege plausibly that the challenged action imposes a burden not only on them or other specific market participants but on the relevant market as a whole.  *Exxon Corp.*, 437 U.S. at 127-28; *see also Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1151 (2012) ("Under the reasoning of *Exxon*, the dormant Commerce Clause does not protect [plaintiffs'] method of operation, nor guarantee [p]laintiffs their preferred method of operation.").  Here, plaintiffs allege that the Ordinance effectively precludes the transport of coal and petcoke in interstate and overseas markets by shutting down the Levin-Richmond Terminal, which is essential to the movement of those products.  Levin and Wolverine claim that if the Levin-Richmond Terminal is not available, coal exports to Japan may need to be shipped from terminals as far away as Mexico.  Plaintiffs further contend that the issue is complex and requires consideration of costs, availability, feasibility of entering into new contracts.  Taking these

allegations as true, the Court finds plaintiffs have adequately alleged a significant burden on the interstate markets for coal and petcoke.

Defendants further aver that the health and safety benefits of the Ordinance justify any burden that the Ordinance may impose on interstate commerce. For purposes of this motion, this argument fails to persuade. While the Court must give appropriate deference to the legislature's judgment, it is not a rubberstamp for the City's adoption of the Ordinance. Plaintiffs allege that the City lacked reliable scientific evidence supporting enactment of the law, and thus, any purported benefits are illusory, arbitrary, or fail to outweigh the burden. Whether the Ordinance in fact imposes an undue burden on interstate commerce is a fact-specific inquiry reserved for a later stage of this case. At this juncture, however, plaintiffs state a plausible dormant Commerce Clause claim based on the *Pike* balancing test.[4] Accordingly, defendants' motions are **DENIED** as to plaintiffs' dormant Commerce Clause claims but granted on the theory of extraterritoriality.

### 2.    *Foreign Commerce Clause*

The foreign Commerce Clause grants Congress the authority to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. The so-called dormant foreign Commerce Clause limits the power of states or municipalities to regulate such commerce, which is "pre-eminently a matter of national concern." *Japan Line, Ltd. v. Cty. of Los Angeles*, 441 U.S. 434, 448 (1979). When construing Congress' power to "regulate Commerce with foreign Nations," and the negative implications of that power, a more extensive constitutional inquiry is required than for the power to regulate interstate commerce. *Id.* ("[T]here is evidence that the Founders intended the scope of

---

[4] Defendants' cited authorities do not counsel otherwise. *See Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 448 (1960) (in case predating *Pike*, finding that ordinance did not exclude vessels from the city port or "destroy the right of free passage," thus not disrupting the required uniformity of interstate commerce); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 556, 472-73 (considering trial evidence of regulation's benefits and burdens and finding that "no approach with a lesser impact on interstate activities" was available); *Pac. Nw. Venison Producers v. Smich*, 20 F.3d 1008, 1016 (affirming summary judgment for state agency on challenge to wildlife regulation where there was "overwhelming evidence that the regulations are unnecessary could add enough force to the mere existence of burdens on interstate commerce to overcome the presumption that the regulations are valid"); *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342, 353 (2008) (not reaching *Pike* examination in regard to century-old taxing practice based on the "current record" of that "particular case").

United States District Court
Northern District of California

1   the foreign commerce power to be the greater [than the interstate commerce power].”); *Norfolk S.*

2   *Corp. v. Oberly*, 822 F.2d 388, 404 (3rd Cir. 1987) (burdens on foreign commerce subjected to

3   “more rigorous and searching scrutiny” (citation omitted)).  To prevail on a foreign Commerce

4   Clause claim, a plaintiff must allege that a state or local law contravenes “specific indications of

5   congressional intent.”  *Barclays Bank PLC v. Franchise Tax Bd.,* 512 U.S. 298, 324 (1994)

6   (citations omitted).

7          Here, plaintiffs allege that defendants’ decision to deny plaintiffs access to the Levin-

8   Richmond Terminal, thereby halting the shipment of coal and petcoke overseas to customers in

9   Europe, Australia, and Asia, impermissibly infringes on the federal government’s exclusive role to

10  regulate foreign commerce.  Defendants counter that plaintiffs’ foreign Commerce Clause claims

11  fail because plaintiffs do not and cannot allege that Congress has articulated a specific policy

12  requiring uniformity in the trade of coal or petcoke.

13         Defendants do not persuade. Congress has declared that the “continuing policy of the

14  Federal Government in the national interest [is] to foster and encourage private enterprise in [] the

15  development of economically sound and stable domestic mining, minerals, metal and mineral

16  reclamation industries,” where “minerals” includes “oil, gas, coal, oil shale and uranium.”  30

17  U.S.C. § 21a.  Further, Congress long has supported the expansion of exports of coal mined in the

18  United States, part of which has involved evaluating the infrastructure (ports, vessels, and rail

19  lines) that support such exports.  42 U.S.C. § 13367.  These are specific indications of

20  Congressional intent to regulate the overseas trade of commodities like coal and petcoke.

21  Accordingly, as with the dormant Commerce Clause claim, defendants’ motion to dismiss the

22  foreign Commerce Clause claim is **DENIED**.

23         **B.      Contract Clause (All Plaintiffs)**

24         The Contract Clause of the U.S. Constitution prohibits states and local governments from

25  passing “any Law impairing the Obligation of Contracts.”  U.S. Const. art. 1, § 10, cl. 1.  To

26  determine whether a state or local law violates the Contract Clause, “the threshold inquiry is

27  ‘whether the state law has, in fact, operated as a substantial impairment of a contractual

28  relationship.’”  *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411

United States District Court
Northern District of California

(1983) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244 (1978)).  "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."  *In re Seltzer*, 104 F.3d 234, 236 (9th Cir. 1996) (quoting *General Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992)).  If the law substantially impairs a private contract, a court next must determine "whether the impairment is both reasonable and necessary to fulfill an important public purpose."  *Id.*

The complaints allege distinct but overlapping Contract Clause claims.  Phillips 66 alleges that the Ordinance burdens its contracts with petcoke purchasers and its "long-standing contract with the Levin-Richmond Terminal for transloading, including storage and handling, of petcoke[.]"  Wolverine alleges that the Ordinance impairs its "existing," "long-term" contracts with Union Pacific Railroad, which transports the coal in interstate commerce from Utah to the Richmond; with Levin, which "exclusively" stores and transfers the coal from railcars to marine vessels for export to Japan; and with purchasers of the coal.  Wolverine also alleges that the Ordinance impairs its ability to renew such contracts, which it does in the ordinary course of its business.  Levin alleges the Ordinance burdens its contracts with Phillips 66 and Wolverine.

Defendants argue that the Contract Clause claims should be dismissed because (i) the Ordinance regulates land use, not plaintiffs' contracts; (ii) plaintiffs' allegations that the Ordinance substantially impairs its contracts are lacking; and (iii) Richmond's actions were reasonable and appropriate as a matter of law.

As to the first argument, defendants contend that plaintiffs cannot establish substantial impairment of a contract where, as here, the challenged law may address the subject matter of alleged contracts, but its effects are only incidental and do not act directly on the contracts' terms.  Defendants rely on *Kaiser Dev. Co. v. City & Cty. of Honolulu*, 649 F. Supp. 926, 928-30 (D. Haw. 1986), *aff'd*, 898 F.2d 112 (9th Cir. 1990), in which a landowner and proposed developer brought an action against the City of Honolulu alleging, in part, that a city ordinance zoning plaintiffs' land for preservation or park use foreclosed a planned development in violation of the Contract Clause.  The court granted summary judgment for defendants, finding that "the zoning regulations did not alter the terms of the contract between [the parties]."  *Id.* at 949 ("[a]n

11

1    otherwise valid law is not unconstitutional merely because an object of regulation is also the

2    subject of a contract," *id*. at 948.).

3    To the extent defendants interpret *Kaiser* as requiring a law, on its face, to regulate, amend,

4    cancel, or mention a contract in order to give rise to a Contract Clause claim, the Court disagrees.

5    Rather, as explained, the threshold inquiry on a Contract Clause claim is "whether the [] law has,

6    *in fact, operated as a substantial impairment* of a contractual relationship."  *Allied Structural*

7    *Steel*, 438 U.S. at 244 (emphasis supplied).  Thus, while the Ordinance regulates land use, and its

8    stated purpose is to promote and protect the health, safety, and welfare of Richmond's citizens,

9    visitors, and workers, plaintiffs nevertheless may maintain a Contract Clause claim if the

10   Ordinance operates so as to substantially impair plaintiffs' contracts.

11   Defendants next contend that even if there is a legal basis for plaintiffs' Contract Clause

12   claims, the complaints fail to plead basic facts about the contracts at issue.  In particular,

13   defendants argue that plaintiffs have not specified the durations of the contracts or whether the

14   contracts anticipated regulatory changes like enactment of the Ordinance.  The Court is not

15   persuaded.  Federal pleading standards do not require such specificity.  Here, plaintiffs allege that

16   they have contracted with each other and with third parties for the transport of coal and petcoke

17   through Levin-Richmond Terminal.  The allegations summarized above are sufficient to provide

18   defendants with notice of the Contract Clause claims asserted.

19   Defendants' cited authorities do not compel otherwise.  *Kaiser* does not require otherwise

20   as it was decided on summary judgment.  649 F. Supp. at 928-30.  *Northwestern Nat'l Life*

21   *Insurance Company. v. Tahoe Regional Planning Agency*, 632 F.2d 104 (9th Cir. 1980) was

22   decided on a motion to dismiss, but it is factually distinguishable.  There, the Ninth Circuit upheld

23   the dismissal of a municipal bondholder's challenge to an ordinance that limited the use of various

24   lands near Lake Tahoe.  *Id*. at 105.  The bondholder claimed the ordinance drastically reduced the

25   value of the land, which had the "indirect effect" of destroying the bondholder's security interest

26   under the bonds and impairing the bondholders' ability to enforce the bonds.  *Id*. at 106.  The court

27   disagreed, noting that neither the statute authorizing issuance of the bonds nor the bonds

28   themselves guaranteed no action would be taken to restrict zoning or affect the value of the lands.

*Id.* at 106-07.  Thus, no obligation was impaired as the bondholder "complain[ed] only of incidental effects on the subject matter of the bonds."  *Id.* at 107.  Here, however, plaintiffs plead more than an "indirect" or "incidental" effect on their contracts.  Plaintiffs claim that the Ordinance prohibits them from doing precisely what they are obligated to do pursuant to contract, namely, transport coal and petcoke to the Levin-Richmond Terminal for shipment overseas.

Finally, defendants argue that even if the Ordinance substantially impairs plaintiffs' contracts, it was reasonable and necessary to protect the health, safety, and welfare of the City's residents, visitors, and workers.  This, too, fails to support dismissal.  Except in unusual circumstances, and even where the Court must show deference to legislative judgment, questions of reasonableness and necessity are fact dependent.[5]  This case is no exception.  Specifically, the complaints allege that the only scientifically reliable environmental testing performed showed no PM2.5 emissions from the terminal; the Richmond Planning Commission found the Ordinance unsupported by reliable scientific evidence and recommended against its adoption; the Bay Area Air Quality Management District emphasized the absence of and need for scientifically reliable data to support the Ordinance; and the microscopic analysis on which the City relied was riddled with scientific errors and did not identify reliably the terminal as the source of the sampled dust.  Dismissal on the basis of reasonableness and necessity thus is inappropriate.

---

[5] Two of the cases on which defendants rely illustrate this point.  In *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,*, 459 U.S. 400, 413-418 (1983), which arose at the summary judgment stage, the court engaged in a detailed factual review of alleged contractual impairments and a law's "reasonableness and necessity" to resolve a Contract Clause claim.  That meant an examination of the timing of the contracts ("At the time of the execution of these contracts, Kansas did not regulate natural gas prices specifically, but its supervision of the industry was extensive and intrusive."); the precise terms of the contracts ("[T]he contracts expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law[.]"); and the context in which the law was enacted ("To analyze properly the Kansas Act's effect, however, we must consider the entire state and federal gas price regulatory structure.").  *Id.* at 413, 416, 418.  Similarly, in *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 (1987), in reviewing the validity of a Commerce Clause case, the Supreme Court evaluated the "asserted justifications" for impairment of contractual waivers caused by Pennsylvania's Subsidence Act.  Specifically, the court reviewed the nature of the waivers (most over 70 years old); the status of the contracting parties (no original covenantors); and legislative goals (deterring mining practices that would have severe effects on the surface).  *Id.* at 504-06.  On that record, the court upheld the tailored means of imposing liability on coal companies to repair damage to achieve Pennsylvania's goal of deterring mining activities destructive to surface land.  *Id.* at 506.  The posture of these cases allowed the courts to conduct a necessary factual analysis that is impossible here.

Accordingly, defendants' motions are **DENIED** as to plaintiffs' Contract Clause claims.[6]

## C.    Preemption Under the Federal Law

Levin and Wolverine allege that three federal statutes—the ICCTA, the Shipping Act, and the HMTA—preempt the City's regulation of coal and petcoke.  The Court addresses each.

### 1.    ICCTA (Levin and Wolverine)

By way of background, the ICCTA was passed in 1995, in part with the purpose of expanding federal jurisdiction and preemption of railroad regulation.  *See* H.R. Rep. No. 104–311 at 95 (1995) ("[C]hanges are made to reflect the direct and complete preemption of State economic regulation of railroads.").  To that end, the ICCTA contains an express preemption clause, which grants the U.S. Surface Transportation Board ("STB") exclusive jurisdiction over "transportation by rail carrier" "as part of the interstate rail network."  49 U.S.C. § 10501(a).  The statute defines "rail carrier" as "a person providing common carrier railroad transportation for compensation."  *Id.* § 10102(5).  "Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation . . . while permitting the continued application of laws having a more remote or incidental effect on rail transportation."  *Florida East Coast Ry. Co. v. City of West Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001).  The ICCTA also may preempt a state law "as applied" if the law "would have the effect of unreasonably burdening or interfering with rail transportation, which involves a fact-bound case-specific determination."  *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 413-14 (5th Cir. 2010).

Levin and Wolverine allege that the Ordinance is expressly and impliedly preempted by the ICCTA because the transport of coal from Utah to Richmond via the Union Pacific Railroad, and within the Levin-Richmond Terminal facility via the Richmond Pacific Railroad Corporation,

---

[6] Proposed intervenors also argue that plaintiffs' Contract Clause claims fail because the coal and petcoke industries are so heavily regulated that plaintiffs reasonably should have expected additional regulation.  While the extent and nature of prior regulation, including the 2015 regulation banning the storage and export of coal and petcoke on city-owned property, is relevant to the question of whether the Ordinance substantially impairs plaintiffs' contracts, the inquiry is premature.

United States District Court
Northern District of California

1    is subject to the exclusive jurisdiction of the STB.  Defendants seek dismissal, arguing that the

2    Ordinance does not "regulate transportation" by a "rail carrier," and in any event, the claims are

3    unripe.

4            Courts repeatedly have held that transloading facilities like the Levin-Richmond Terminal

5    may constitute "rail carriers" under the ICCTA's preemption provision.  *See, e.g., Grosso v.*

6    *Surface Transp. Bd.*, 804 F.3d 110, 118 (1st Cir. 2015) ("It is well-established that the preemption

7    of state and local regulation under the ICCTA generally extends to transloading facilities.") (citing

8    cases); *Green Mountain Railroad Corp. v. State of Vermont*, 404 F.3d 638, 640 (2nd Cir. 2005)

9    (railroad corporation proposing construction of transloading facilities on property along its rail

10   line was "rail carrier" under ICCTA).  As defendants correctly note, these cases generally arise

11   where the operator of the interstate rail (i.e., the "rail carrier") also owns and operates a

12   transloading facility that performs rail-related activities.  *See Valero Ref. Company Petition for*

13   *Declaratory Order*, No. FD 36036, 2016 WL 5904757, at *3 (S.T.B., Sept. 20, 2016) ("The

14   [STB]'s jurisdiction extends to rail-related activities that take place at transloading (or, as here,

15   off-loading) facilities if the activities are performed by a rail carrier, the rail carrier holds out its

16   own service through a third party that acts as the rail carrier's agent, or the rail carrier exerts

17   control over the third party's operations.").  That is not what is alleged here.  However, this case

18   presents a unique set of facts not squarely addressed by the cases cited.  Levin and Wolverine

19   allege that the Union Pacific Railroad carries coal from Utah to Richmond, where it is transferred

20   from Union Pacific's rail lines to Richmond Pacific's rail lines by Richmond Pacific Railroad

21   Corporation, a Class III rail common carrier and wholly owned subsidiary of Levin Enterprises,

22   Inc., which owns the terminal.  The Richmond Pacific rail lines allegedly transfer the coal into an

23   enclosed unloading facility within the terminal.  In other words, Levin and Wolverine allege that

24   the Union Pacific rail lines, the Richmond Pacific rail lines, and the Levin-Richmond Terminal are

25   part of an integrated rail system, and further, the Ordinance disrupts this system by effectively

26   requiring Wolverine to take its coal elsewhere.  Whether the Ordinance in fact regulates

27   transportation by rail carrier or simply has incidental effects on a rail system "is a case-by-case,

28   fact-specific determination," *id.*, but at this juncture, the allegations support a plausible claim,

15

especially given the stated purposes of the ICCTA.[7]

With respect to as-applied preemption, defendants raise two issues of ripeness and inadequate allegations of improper interference.  These arguments fail to persuade.  As to ripeness, nothing in the case law suggests Levin and Wolverine were required to seek an exception under the Ordinance before bringing their ICCTA claims.  Moreover, there would be no reason for the City to adopt the Ordinance in the first place if it was willing to exercise its discretion to grant the Levin-Richmond Terminal—the only facility affected by the Ordinance—an exemption.[8]  As to the sufficiency of the allegations, for the reasons discussed, the Court finds that resolution of the ICCTA claims requires a full record.[9]  At this stage in the proceedings, the allegations are sufficient.  As such, defendants' motions to dismiss the ICCTA claims are **DENIED**.

### 2.    *The Shipping Act (Levin and Wolverine)*

The Shipping Act aims to "establish a nondiscriminatory regulatory process for the common carriage of goods by water in the foreign commerce of the United States with a minimum of government intervention and regulatory costs."  46 U.S.C. § 40101; *see also In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 79 (3d Cir. 2017) ("[T]he Act seeks to promote economically sound, evenhanded, and efficient ocean commerce that responds to international shipping practices.").  To that end, the Shipping Act regulates agreements among ocean common carriers and marine terminal operators and requires that such agreements be filed with the Federal Maritime Commission.  46 U.S.C. §§ 40301, 40302.  Another central feature of the Shipping Act is an exemption from the antitrust laws.  *Id*. § 40307.  Additionally, and relevant here, the Shipping Act contains an anti-discrimination provision that provides:

---

[7] The Court is not persuaded that the ICCTA claims fail simply because the Ordinance states that it "is not intended to and shall not be interpreted to regulate the transportation of coal and/or petroleum coke, for example, by train or marine vessel."  The Court's focus is on whether the Ordinance *in fact* manages or governs transportation by rail carrier.

[8] Indeed, plaintiffs allegedly presented information to the City challenging the adequacy of the amortization period *prior* to enactment of the Ordinance.

[9] For example, at the pleading stage there is no evidence of disruption to a single rail carrier's business as opposed to an interstate rail network, or whether the Ordinance represents an appropriate public health and safety regulation with only incidental effects on interstate railroads. These are fact-dependent inquiries.

United States District Court
Northern District of California

> A marine terminal operator may not—(1) agree with another marine terminal operator or with a common carrier to boycott, or unreasonably discriminate in the provision of terminal services to, a common carrier or ocean tramp; (2) give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any person; or (3) unreasonably refuse to deal or negotiate.

*Id*. § 41106.  The Shipping Act does not expressly preempt state or local regulation of shipping, and thus, state and local laws survive preemption challenges where they do not directly conflict with the Act.  *See Pac. Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1416 (9th Cir. 1990).

Levin and Wolverine claim such a conflict exists.  Specifically, they allege that the Ordinance will force Levin to refuse marine terminal services to shippers of coal and petcoke, and thus to discriminate against shippers of particular commodities, without any rational basis.  Levin also alleges that the Ordinance conflicts with the Shipping Act by increasing government intervention in the transport of goods by water and diminishing the growth, development, and efficiency of ocean transportation.

Defendants counter that the Shipping Act claims fail because the Ordinance expressly provides that it does not regulate shipping activities, nor does it regulate agreements among marine terminal operators that fall within federal authority.  Defendants also aver that the Shipping Act prohibits discrimination by "marine terminal operators," which does not include the City.  Further, defendants argue that even if the Ordinance incidentally affects shipping and regulates a "marine terminal operator," it is not preempted because it is a legitimate land use ordinance and does not require Levin to engage in discriminatory practices.

The Court disagrees. As an initial matter, the Court is doubtful of defendants' contention that the Shipping Act "focuses primarily on conduct by nongovernmental entities."  The Shipping Act applies equally to governmental and nongovernmental entities.  *See Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 543 (D.C. Cir. 1988) (local government authority was a "marine terminal operator"); *see also State of Cal. v. United States*, 320 U.S. 577, 585 (1994) (municipal waterfront terminals and corporations are subject to the Shipping Act).  Moreover, defendants' argument misunderstands plaintiffs' claims.  Levin and Wolverine do not allege that the City has violated the Shipping Act.  Rather, they allege that the

17

Ordinance is preempted because it requires Levin to act in a manner that conflicts with the Shipping Act. Thus, it is of no consequence for purposes of this action that the City itself is not a "marine terminal operator," so long as its ordinance may regulate one.

Defendants' remaining arguments are largely conclusory. Whether the Ordinance requires Levin to "discriminate unreasonably," lacks a rational basis, or regulates agreements amongst marine terminal operators that are subject to federal authority, are all questions to be answered on a full record. At this juncture, the Court's review is limited to the allegations in the complaints. Those allegations are that the Ordinance would require Levin to discriminate against shippers of coal and petcoke without credible evidence or a rational basis to support its regulation of marine services at Levin-Richmond Terminal. Contrary to defendants' assertion, the Ordinance does not "appl[y] equally to all entities within Richmond," but rather, applies to owners and operators of facilities that store and handle two specific products. Moreover, as alleged in the complaint and confirmed at the hearing, Levin-Richmond Terminal is the only facility affected by the Ordinance. The allegations are sufficient to state a claim of preemption under the Shipping Act. *See Reed v. City & Cty. of San Francisco*, 10 Cal. App. 4th 572, 574-75 (1992) ("If a discriminatory practice is prohibited by the Shipping Act's unreasonable discrimination prohibition . . . , any application of San Francisco's divestment ordinance to preclude a marine terminal agreement because a shipper does business with South Africa would conflict with the Act[.]"); *see also Plaquemines Port*, 838 F.2d at 547-8 (denying review of Federal Maritime Commission's finding that tariff exemptions for certain wharves, docks, and vessels violated antidiscrimination standards of the Shipping Act). Defendants' motions to dismiss the Shipping Act claims are **DENIED**.

### 3. Hazardous Materials Transportation Act ("HMTA") (Wolverine)

The HMTA, 49 U.S.C. § 5101, *et seq.*, establishes a scheme of uniform federal regulations for transportation of hazardous materials. *S. Pac. Transp. Co. v. Pub. Serv. Comm'n of Nevada*, 909 F.2d 352, 355 (9th Cir. 1990). The HMTA authorizes the U.S. Secretary of Transportation to designate materials as hazardous and regulate their safe transportation. 49 U.S.C. § 5103. It expressly preempts state and local requirements where (1) it is impossible to comply with those requirements and federal requirements under the HMTA, or (2) those requirements create "an

United States District Court
Northern District of California

1   obstacle to accomplishing and carrying out" the HMTA or related regulations.  *Id.* § 5125(a).

2        Wolverine claims that the HMTA preempts the Ordinance because the Secretary of

3   Transportation has not designated coal a "hazardous material," but the Ordinance treats it as such

4   by prohibiting its storage and handling at Levin-Richmond Terminal.  Wolverine further alleges

5   that even if coal is hazardous, its storage and handling at the terminal merely is incidental to its

6   transport and shipment, and thus, is excluded from regulation under state or local law.

7        Wolverine fails to state a cognizable legal theory of preemption under the HMTA.  As

8   Wolverine admits, coal is not a federally designated "hazardous material" subject to the HMTA.

9   Nothing in the HMTA suggests that the Secretary of Transportation's silence or nonregulation of a

10  certain material preempts a state or local law regulating that material.  It strains logic for

11  Wolverine to argue otherwise.  *See Waering v. BASF Corp.*, 146 F. Supp. 2d 675, 681 (M.D. Pa.

12  2001) (holding that HMTA did not preempt state law claims stemming from exposure to chemical

13  that was not a federally designated hazardous material).  The Ordinance is not preempted by the

14  HMTA, and thus, defendants' motions to dismiss Wolverine's HMTA claim are **GRANTED WITH**

15  **PREJUDICE**.

16        **D.    Due Process Clause (Levin and Wolverine)**

17       "[A] regulation that fails to serve any legitimate governmental objective may be so

18  arbitrary or irrational that it runs afoul of the Due Process Clause."  *Lingle v. Chevron U.S.A. Inc.*,

19  544 U.S. 528, 542 (2005).  "To constitute a violation of substantive due process, the alleged

20  deprivation must 'shock the conscience and offend the community's sense of fair play and

21  decency.'"  *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013)

22  (quoting *Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012)).

23       Levin and Wolverine allege that the City arbitrarily interfered with their property rights by

24  enacting the Ordinance without a rational basis or credible evidence, in violation of their due

25  process rights.  Defendants move to dismiss, asserting that enactment of the Ordinance is squarely

26  within the City's exercise of its police power and survives rational basis review.  While the

27  plaintiffs ultimately must meet a high burden of showing that the Ordinance is arbitrary and

28  irrational, their allegations pass muster at this early stage in the proceedings.  As explained in

Section II.B.2., the complaints contain numerous allegations challenging the reliability and sufficiency of the evidence on which the City purportedly relied in passing the Ordinance.  At this juncture, taking these allegations as true, Levin and Wolverine have stated a plausible due process claim.  Defendants' motions to dismiss the due process claims are **DENIED**.

> ### E.  Takings Clause (Levin)

A law may violate the Takings Clause either facially or as applied.  In a facial takings challenge, the plaintiff must demonstrate that the "mere enactment" of a law "constitutes a taking." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 493 (1987).  A land use regulation can result in a facial taking if it "does not substantially advance legitimate state interests . . . or denies an owner economically viable use of [their] land." *Id.* at 485.  In an as-applied challenge, the Court must engage in an "ad hoc, factual inquir[y]." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  The test involves a multi-factor examination of, among other things, the economic impact of the regulation, the extent to which the regulation has interfered with investment-backed expectations, and the character of the government action. *Id.*

Levin claims that the Ordinance constitutes a facial and as-applied violation of the Takings Clause.  Specifically, Levin alleges that the Ordinance denies it all economically viable uses of the terminal, which Levin has vested right to continue operating as a legal non-conforming land use.  Levin further alleges that the Ordinance is not based on a valid exercise of police power.

Defendants move on three grounds.  First, defendants argue that the Ordinance avoids a facial taking by providing a three-year amortization period designed to ensure that Levin can recoup reasonable investments in its operations and transition to storage of permitted substances or other permitted uses.  Courts have long recognized amortization periods as a valid tool for balancing the competing interests of a landowner's property rights and a local agency's need to implement zoning changes to benefit public health and welfare.  However, even defendants' authorities make clear that an amortization period is not an absolute or unqualified defense to a takings claim.  Rather, legislation may validly provide for the eventual termination of nonconforming property uses without compensation if it "provides a *reasonable* amortization period *commensurate with the investment involved*." *Elysium Institute, Inc. v. Cty. of Los Angeles*,

232 Cal. App. 3d 408, 436 (1991) (emphasis supplied).

Here, Levin challenges the reasonableness and adequacy of the amortization period.  Its complaint alleges, based on analysis from the Berkeley Research Group, that the amortization period is "economically unsupportable and arbitrary," the criteria for seeking a variance from the Ordinance are "misguided and fail to take account of the nature of the facility and the market" for suitable alternative commodities, and the Ordinance is likely to put the terminal out of business. Levin further alleges that the terminal "is a unique marine facility," and given market conditions, physical constraints, and infrastructure requirements, "it would be speculative to suggest that any [] alternative dry bulk business will be available to [the terminal] in the foreseeable future." Taking these allegations as true, the Court cannot find at this juncture that the amortization period shields defendants from a takings claim.[10]

Second, defendants argue that Levin's facial takings claim fails because the Ordinance includes a mechanism for extending the amortization period, pursuant to which the City is required to grant a variance if the applicant can show a longer period is necessary to avoid a taking.  Defendants note that the factors for the City to consider in deciding whether applicants are eligible for relief under the Ordinance—including the value of the property and improvements, the length of time the operation has been in existence, and the impact on the local community—mirror those identified by the California Supreme Court for assessing the reasonableness of an

---

[10] Defendants' other cited authorities do not compel a different result.  In *Outdoor Systems, Inc. v. City of Mesa*, 997 F.2d 604, 618 (9th Cir. 1993), the Ninth Circuit held that there was no constitutional taking where a law required existing nonconforming billboards to be removed before the property would be approved for development.  The court emphasized that the law did not apply unless the land was developed, and thus, property owners remained free to display billboards for as long as they wanted so long as they did not develop the land.  *Id*.  Here, plaintiffs allege that the Ordinance applies as soon as the amortization period expires.  Additionally, *Outdoor Systems* was decided at the summary judgment stage.  Likewise, in *City of Los Angeles v. Gage*, 127 Cal. App. 2d 442, 460-61 (1954), the court held that a zoning ordinance requiring discontinuance of certain nonconforming uses within five years was a constitutional exercise of the police power.  In so finding, the court noted that "[t]he distinction between an ordinance restricting future uses and one requiring the termination of present uses within a reasonable period of time is merely one of degree, and constitutionality depends on the relative importance to be given to the public gain and to the private loss."  *Id*. at 460.  Thus, the court considered a variety of factors in the record, including the costs and feasibility of relocating the nonconforming uses at issue.  *Id*. at 461.  This Court does not have a full factual record before it at this stage.

United States District Court
Northern District of California

1    amortization period.  *See Metromedia, Inc. v. City of San Diego,* 26 Cal. 3d 848, 883-84 (1980),

2    *rev'd on other grounds* 453 U.S. 490 (1981).  Again, however, Levin's complaint alleges that the

3    variance procedure is inadequate, inapplicable, and fails to take account of the nature of the

4    facility and the market for suitable alternative commodities to replace coal and petcoke.  Further,

5    the City's use of the California Supreme Court's factors in considering the reasonableness of the

6    amortization period does not insulate defendants from judicial review, particularly at the motion to

7    dismiss stage.

8           Third, defendants argue the as-applied challenge is not ripe for review because Levin has

9    not availed itself of the variance procedures in the Ordinance.  Defendants note that both federal

10   and state takings law provide that a takings claim is not ripe until a landowner receives "a final

11   and authoritative determination of the type and intensity of development legally permitted on the

12   subject property."  *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986); *see*

13   *also Landgate, Inc. v. California Coastal Comm'n*, 17 Cal.4th 1006, 1018 (1998) (same).  A final

14   decision requires, at a minimum, that plaintiffs "meaningful[ly]" request and be denied a variance

15   from the challenge regulation before bringing a regulatory taking claim.  *S. Pac. Transp. Co. v.*

16   *City of Los Angeles,* 922 F.2d 498, 503 (9th Cir. 1990).  The only exception is where the

17   landowner can establish that an attempt to comply with that requirement would be "futile."  *Kinzli*

18   *v. City of Santa Cruz*, 818 F.2d 1449, 1454, *modified,* 830 F.2d 968 (9th Cir. 1987).

19          A plaintiff generally cannot invoke the exception where it has not attempted to comply

20   with the available administrative relief provision.  *County of Alameda v. Superior Court,* 133 Cal.

21   App. 4th 558, 568 (2005).  As explained with respect to the ICCTA claims, however, the Court

22   finds the takings claim appropriate for review on a full record.  Given that the Levin-Richmond

23   Terminal is the only facility subject to the Ordinance, and Levin allegedly submitted materials to

24   the City in the course of objecting to adoption of the Ordinance, it would be futile for Levin to

25   seek relief through the variance procedures in the Ordinance.  Moreover, the Court notes that the

26   purpose of the amortization period is to ensure discontinuance of coal and petcoke storage and

27   handling at the terminal.  Thus, even if the City granted Levin an extension, Levin could not

28   maintain its current use of the terminal indefinitely.  The claim is ripe for review.  Defendants'

1  motion to dismiss Levin's takings claim is **DENIED**.

2      **F.**    **Equal Protection Clause (Levin)**

3      "Scrutiny under equal protection analysis is essentially equivalent to [rational basis]

4  scrutiny under due process doctrine." *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990); *see*

5  *also Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990)

6  (in considering equal protection claim, holding that "municipal decisions are presumptively

7  constitutional and, therefore, need only be rationally related to a legitimate state interest, unless the

8  distinctive treatment of the party involves either a fundamental right or a suspect classification").

9      Levin brings an equal protection claim, alleging that the Levin-Richmond Terminal is the

10  only facility affected by the Ordinance, and the City's singling out of this facility, arbitrarily with

11  without any rational basis, interferes with Levin's property rights.  Defendants move to dismiss on

12  the basis that the City acted with a rational basis.  This argument is subject to the same

13  deficiencies as the due process claims.  That is, even applying the rational basis test, Levin's

14  allegations are adequate to state a plausible claim for relief.  *See Del Monte Dunes*, 920 F.2d at

15  1508-09  (allegations that city "arbitrarily and unreasonably limited use and development of this

16  property," and that appellants "were singled out to bear the burden" of the city's "rational"

17  environmental objectives, were adequate to support equal protection claim); *Sacramento Cty.*

18  *Retired Emps. Ass'n v. Cty. of Sacramento*, No. CIV S-11-0355 KJM, 2012 WL 1082807, at *6

19  (E.D. Cal. Mar. 31, 2012) (in an equal protection case, "it is not the court's task on a motion to

20  dismiss to determine whether defendant's actions were rationally related to its legitimate interest;

21  rather, the court must determine whether plaintiffs have stated a claim for violation of the federal

22  and state Equal Protection clauses.").  Defendants' motion to dismiss Levin's equal protection

23  claim is **DENIED**.

24  **III.**    **MOTIONS TO INTERVENE**

25      Sierra Club and San Francisco Baykeeper bring joint motions to intervene in this action as

26  a matter of right, and in the alternative, permissively.  The Court addresses each basis for

27  intervention in turn.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### A.     Intervention as a Matter of Right

Federal Rule of Civil Procedure 24(a) requires evidence of four factors to grant intervention: (1) the motion must be timely; (2) the applicant must claim a significantly protectable interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action. *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011).

Plaintiffs do not dispute that the first factor is satisfied. The Court agrees and further finds that the second and third factors also are satisfied. That is, the Court is persuaded that disposition of this case would impair proposed intervenors' interests because members of the Sierra Club and San Francisco Baykeepers are among the intended beneficiaries of the Ordinance and they worked extensively to secure passage of the Ordinance.[11]

On the other hand, the Court is not persuaded that proposed intervenors' interests will not be represented adequately by defendants. A rebuttable presumption of adequacy applies where a proposed intervenor and an existing party have the same ultimate objective, or where the government is acting on behalf of its constituency. *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011). These presumptions apply here. Proposed intervenors argue that they nevertheless are entitled to intervene as a matter of right because their interests are narrow, personal, and mission-driven, whereas defendants have broader, often conflicting interests in public health, the environment, and the economy. Proposed intervenors also argue that the City may be unable to adequately represent their interests due to its budget shortfalls and related pressures caused by the COVID-19 pandemic. However, proposed intervenors' briefing on the motions to dismiss was largely duplicative of defendants' briefing, and further, defendants'

---

[11] Levin is the only plaintiff to argue proposed intervenors do not meet the second and third factors, arguing that there is no credible evidence that the Ordinance is necessary for its asserted goal of protecting public health, safety, and welfare. This argument goes to the merits of the case, however, and does not undermine proposed intervenors' asserted interests in this case.

counsel zealously advocated for their clients at the hearing on the motions. Proposed intervenors have not made a compelling showing of inadequacy of representation. Thus, intervention as a matter of right is not warranted.

**B.     Permissive Intervention**

Federal Rule of Civil Procedure 24(b) provides for permissive intervention where: (1) independent grounds for jurisdiction exist; (2) the motion is timely; and (3) proposed intervenors' claim or defense shares a common question of law or fact with the main action. Fed. R. Civ. P. 24(b); *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997). Even where all prerequisites are met, a district court has considerable discretion in ruling on a motion for permissive intervention. *In re Benny*, 791 F.2d 712, 721-22 (9th Cir. 1986). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

The Court finds that permissive intervention is warranted. As stated above, there is no dispute that the motions are timely. Further, in federal question cases, "the district court's jurisdiction is grounded in the federal question(s) raised by the plaintiff." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011). Where, as here, proposed intervenors do not raise new claims, "the jurisdictional concern drops away." *Id*. Proposed intervenors intend to defend the Ordinance against each of the claims raised in plaintiffs' complaints, and thus, their defenses share common questions of law with the main action. Additionally, allowing intervention will result in minimal delay and cause no prejudice to plaintiffs.

However, and most compelling, while proposed intervenors have not shown that COVID-19 will render defendants' representation inadequate, the Court is mindful of the challenges faced by municipalities because of the pandemic. Given the unprecedented nature of these times, and the important constitutional and preemption questions raised in this action, the Court finds limited intervention appropriate. Accordingly, the Court GRANTS Sierra Club and San Francisco Baykeepers' motions to intervene with limits. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375-78 (1987) (approving limitations). As such, intervention shall be subject to the conditions set forth in Section IV below.

**IV.    CONCLUSION**

For the foregoing reasons, the Court hereby **ORDERS** as follows:

(1) Defendants' motions to dismiss are **DENIED**, except with respect to the Hazardous Materials Transportation Act claim, which is **DISMISSED WITH PREJUDICE**;

(2) Sierra Club and San Francisco Baykeepers' motions to intervene are **GRANTED**, subject to the following conditions:

    a.  Sierra Club and San Francisco Baykeepers may not expand the scope of this action or raise new issues.  They may not file any motion independent of the defendant, including a motion to dismiss, or seek to assert any counterclaims.  They may only file their proposed answer.  Any filings must be made jointly with the defendants and may not be duplicative. All filings must be in accordance with this Court's Standing Order.

    b.  Similarly, all discovery shall be coordinated with defendants and made in conjunction therewith.  Intervenors' status shall not increase the scope of discovery.

(3) Defendants shall answer the complaints by no later than **September 14, 2020**.

This Order terminates Docket Numbers 20, 28, 29, 30, 42, and 43 in Case No. 20-cv-1643; Docket Numbers 20, 28, 29, 30, 45, and 46 in Case No. 20-cv-1614; and Docket Numbers 19, 27, 28, 29, 44, and 45 in Case No. 20-cv-1609.

**IT IS SO ORDERED.**

Dated: August 27, 2020

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California